625 N.W.2d 744 (1999)
461 Mich. 1291
In re BROWN.
Docket No. 111840.
Supreme Court of Michigan.
October 10, 1999.
On order of the Court, the Judicial Tenure Commission having issued a December 15, 1999, Decision and Recommendation for order of discipline in response to this Court's November 2, 1999, remand order [ante, 1209], we again remand this case to the Judicial Tenure Commission for the articulation of standards of judicial discipline, and for the application of those standards to the instant case.
Const. 1963, art. 6, § 30 provides for the establishment of the Judicial Tenure Commission, and that it may recommend judicial discipline. The constitution requires this Court, through its rule making authority, to implement this provision, which it has done in subchapter 9.200 of the Michigan Court Rules. In particular, this Court has specified the form in which the JTC is to render its decisions. MCR 9.221(B). Such a requirement exists so that this Court has the additional information necessary to perform its own constitutional function of judicial discipline under Const. 1963, art. 6, § 30(2). In this regard, we observe that this Court has the authority to require even agencies of the executive branch to render decisions in a form that allows for meaningful review. Woody v. Cello-Foil Products (After Remand), 450 Mich. 588, 597, 546 N.W.2d 226 (1996); Kostamo v. Marquette Iron Mining Co., 405 Mich. 105, 136, 274 N.W.2d 411 (1979).
As a constitutionally created state agency charged with making recommendations to this Court concerning matters of judicial discipline, the JTC is entitled, on the basis of its expertise, to deference both with respect to its findings of fact and its recommendations of sanction. However, such deference cannot be a matter of blind faith, but rather is a function of the JTC adequately articulating the bases for its findings and demonstrating that there is a reasonable relationship between such findings and the recommended discipline.
Increasingly, justices of this Court have concluded that review of the JTC's disciplinary recommendations is hampered because the standards by which the JTC is producing its recommendations is not apparent. There is an insufficient articulation of the connectedness between the findings of fact in an individual case and the recommended discipline. While this Court has no doubt that each member of the JTC is attempting conscientiously to prioritize cases in some fashion, we believe that such prioritization must be a matter of law rather than a function of the individual and unstated consciences of these members.
The most fundamental premise of the rule of law is that equivalent misconduct should be treated equivalently. Because the JTC has no written standards for categorizing and prioritizing its cases, this Court's ability to meaningfully review its recommendations is hindered. We are frequently left to consider the alleged misconduct in a legal vacuum, deciding whether a particular recommended sanction strikes us, by our own consciences, as commensurate with the wrongdoing. This is akin to standardless review of an apparently standardless decision, and thus it is not an appropriate exercise in decision making for a judicial body. In our judgment, it is the burden of the JTC to persuade this Court that it is responding to equivalent cases in an equivalent manner and to unequivalent cases in a proportionate manner. In other words, to demonstrate that there is a consistently enforced system of judicial discipline in Michigan.
*745 This burden can best be satisfied by the promulgation of standards by the JTC. Where such standards have been promulgated and reasonably followed by the JTC, its recommendations are entitled to considerable deference as the expert agency in matters of judicial discipline. The importance of such standards is both in ensuring that the JTC is consistent in its consideration of factors relevant to the level of sanctions, and in enabling this Court, by its constitutional obligation, to meaningfully review the JTC's recommendations. While we do not purport to substitute our judgment for that of the JTC in this regard, some of these standards are obvious. For example, everything else being equal:
(1) misconduct that is part of a pattern or practice is more serious than an isolated instance of misconduct;
(2) misconduct on the bench is usually more serious than the same misconduct off the bench;
(3) misconduct that is prejudicial to the actual administration of justice is more serious than misconduct that is prejudicial only to the appearance of propriety;
(4) misconduct that does not implicate the actual administration of justice, or its appearance of impropriety, is less serious than misconduct that does;
(5) misconduct that occurs spontaneously is less serious than misconduct that is premeditated or deliberated;
(6) misconduct that undermines the ability of the justice system to discover the truth of what occurred in a legal controversy, or to reach the most just result in such a case, is more serious than misconduct that merely delays such discovery;
(7) misconduct that involves the unequal application of justice on the basis of such considerations as race, color, ethnic background, gender, or religion are more serious than breaches of justice that do not disparage the integrity of the system on the basis of a class of citizenship.
The JTC should consider these and other appropriate standards that it may develop in its expertise, when it offers its recommendations. Where standards of this sort have been promulgated and reasonably applied to individual cases, this Court owes considerable deference to the JTC.[1] However, such deference is that owed to an expert agency.[2]
The notion that unexplained disparities in punishment cannot be countenanced by a system with hopes of maintaining the public's faith in its just and fair administration is hardly a new one. Rather, it is a notion that this Court has accepted and implemented with considerable effectiveness *746 in the context of criminal sentencing guidelines. Such guidelines, which compartmentalized various wrongs by their type and accounted for aggravating and mitigating factors involving both the history of the offender and the circumstances of the offense, were premised upon the notion that similarly situated individuals should not be sentenced in a widely disparate manner depending upon the personal inclinations of the prosecutors by whom they were charged and the judges by whom they were sentenced. See Administrative Order No.1988-4, 430 Mich. ci.[3] Similar sentencing guidelines have been enacted by the Congress and by the majority of states.
In addition, curtailing unjustified sentence disparities was also the principal motivation for first expanding the scope of appellate review of criminal sentences in Michigan. People v. Coles, 417 Mich. 523, 545-546, 339 N.W.2d 440 (1983). Later, in place of a standard of review that asked whether a sentence "shocked the conscience," a standard was substituted that was more susceptible to comparisons of sentences that asked whether a particular sentence was proportionate. People v. Milbourn, 435 Mich. 630, 635-637, 461 N.W.2d 1 (1990).
To the extent that the JTC has, in the past, relied on this Court's opinion in State Bar Grievance Administrator v. Del Rio, 407 Mich. 336, 285 N.W.2d 277 (1979), to conclude that comparison of unrelated cases is improper, the JTC's reliance is misplaced. In Del Rio, this Court said that "we find dubious the notion that judicial or attorney misconduct cases are comparable beyond a limited and superficial extent." Id. at 350, 285 N.W.2d 277. This merely states the obvious proposition that such comparisons are inevitably limited, not that they have no value, and that when discipline in disparate cases falls within an appropriate range, the dissimilarities outweigh the similarities. In a similar vein, in the attorney discipline matter of In re Grimes, 414 Mich. 483, 490, 326 N.W.2d 380 (1982), this Court noted that while "analogies are not of great value" in reviewing the discipline imposed in a given case, "we are mindful of the sanctions meted out in similar cases." The language from Del Rio is no justification for no longer even being "mindful" in this way. Indeed, in Del Rio itself, where this Court determined that comparisons had little value, reference nevertheless was made to the JTC's characterization of the case, which stated:
"The huge number of instances of misconduct culled from his three-year term of office demonstrate a degree and breadth of misconduct far beyond any record heretofore presented in the eight-year history of this Commission. If respondent's record of misconduct were divided equally among ten judges, there would be enough evidence to warrant removal of each of them." [Del Rio, supra at 350, 285 N.W.2d 277.]
It is obvious that no two judicial misconduct cases are identical, any more than two criminal cases are identical. Our system recognizes this truism in the criminal context by according considerable deference to trial judges to take into account the unique circumstances of individual criminal offenses and offenders and to individualize criminal sentences, albeit within broad constraints designed to ensure *747 that a consistent rule of law is being applied. This Court is aware of no reason why this balance should not be similarly sought in the realm of judicial misconduct proceedings.
We are not oblivious to the broad range of considerations that may be relevant to the JTC in determining appropriate sanctions, or to the difficulty in articulating these considerations in each case. Nevertheless, it is incumbent upon the JTC that it undertake a reasonable effort in this regard in order to ensure a consistent rule of law with respect to its constitutional responsibilities as well as to enable this Court to effectively carry out its own constitutional responsibilities.
As for any concern that comparing unrelated cases jeopardizes the due process rights of the parties,[4] we do not find this concern to have any basis. Due process of law is essentially the legal equivalent of procedural fairness. It is a concept that "calls for such procedural protections as the particular situation demands." Mathews v. Eldridge, 424 U.S. 319, 333-334, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); In re Brock, 442 Mich. 101, 110-111, 499 N.W.2d 752 (1993). It is a far-fetched proposition to assert that this Court's effort to assure the propriety of the JTC's recommendations, by inquiring into the standards being applied and the consistency of their application, offends this notion in any manner.
As the judges on the JTC can attest from their experience in criminal proceedings, there is a distinction between evidence that may be considered in determining guilt and evidence that may be considered in imposing punishment. Consequently, once the JTC has completed its fact finding, comparing unrelated cases poses little risk to the truth-discovery process and could only affect the weight this Court gives the recommended sanctions. Indeed, in light of the concerns that require these comparisons, regarding the evenhandedness of treatment in judicial discipline cases, compliance by the JTC with the instant order is decidedly more fair, and provides substantially more process of law, than would a failure by this Court to insist on clarification of the JTC's standards for carrying out its role. With due respect to the JTC, we believe that any reluctance to provide a legal context for its recommendations is the more significant impairment of due process.
Pursuant to our authority under MCR 9.224 and 9.203(C), we again remand this matter to the JTC for the articulation of standards of judicial discipline, and for the application of those standards to the instant case, in order that this Court can meaningfully carry out its powers of judicial review under Const. 1963, art. 6, § 30(2).[5] The Judicial Tenure Commission shall file its reconsidered recommendation within 60 days of the date of this order.
Jurisdiction is retained.
MICHAEL F. CAVANAGH and MARILYN J. KELLY, JJ. We would accept the recommendation of the Judicial Tenure Commission.
NOTES
[1] See, e.g., American Judicature Society, How Judicial Conduct Commissions Work, pp. 15-16; In re Inquiry Concerning a Judge, 788 P.2d 716, 725 (Alas., 1990); Mississippi Judicial Performance Comm. v. Walker, 565 So.2d 1117, 1124-1125 (Miss, 1990); In re Deming, 108 Wash.2d 82, 119-120, 736 P.2d 639 (1987).
[2] For example, the JTC majority recommendation in this case, which was reached as a result of this Court's earlier remand, explains that the misconduct at issue would only warrant a public censure, but for the four prior occasions when respondent was admonished for misconduct, and that this prior history is what elevates the appropriate sanction to a fifteen-day suspension without pay. Because this Court is sufficiently apprised of the JTC's assessment of the misconduct at issue in the abstract, and the level of aggravation it attaches to respondent's prior record, its finding can be accorded appropriate weight within this limited range. However, there is no articulation of how respondent's attempt to use the prestige of his office to gain a personal advantage would rank in comparison to other types of misconduct, or what there is about this type of misconduct that makes it less or more egregious than other acts of misconduct.
[3] Although these judicially imposed guidelines have been supplanted by statutory guidelines for crimes committed after January 1, 1999, see M.C.L. § 769.34; MSA 28.1097(3.4); Administrative Order No. 1998-4, 459 Mich. clxxv, the Legislature has adopted the same premises in its guidelines, namely, that the appearance of evenhanded justice, as well as its actual achievement, requires adherence by judicial authorities to rules or standards.
[4] See, for example, the December 16, 1999, response of the Judicial Tenure Commission to this Court's November 5, 1999, order in In re Baxter, Docket No. 111716.
[5] We emphasize again that it is not our conclusion here that the JTC process is, in fact, "arbitrarily employed," but merely that the present absence of articulated standards communicates an appearance problem, and that such absence undermines the ability of this Court to carry out meaningful judicial review.