Per Curiam.
The Judicial Tenure Commission recommends that we suspend Wayne Circuit Judge Cynthia Gray Hathaway for thirty days, without pay, for misconduct in the performance of her judicial office. Because we conclude that the severity of the misconduct at issue warrants greater discipline than recommended, pursuant to Const 1963, art 6, § 30(2) and MCR 9.225, we modify the recommendation of the commission and order that Judge Hathaway be suspended without pay for a period of six months.
i
FACTS
The recommendation of the Judicial Tenure Commission is based on its findings of fact. In turn, those findings are adopted from findings made by the master.[1] Specifically, the commission found that Judge Hathaway acted improperly in her handling of two cases, and in an overall lack of industry that was exemplified by a third case.[2]
*675 A
The first case is a drug prosecution, People v Spearman, in which Judge Hathaway conducted an arraignment at a Detroit police precinct. With regard to this case, the commission adopted these findings of the master:
Late in the afternoon of May 6, 1997, Attorney Otis Culpepper, criminal lawyer, called the Respondent at her home as she was arriving from work. He advised that his client, Bruce John Spearman[,] had been arrested by the Detroit Police Department on a marijuana charge. His client was on bond from federal district court on a drug charge. Bond was $30,000 cash and required that he wear a tether. He further requested that Respondent come to the 7th District Precinct office and arraign the defendant so that he could be released and abide by the federal release restriction to be at his home by 7:30 in the evening. Police Lt. Gary D. Hendrix and Attorney Otis Culpepper both testified that Respondent knew that there were additional drug charges, including cocaine and heroin, before the arraignment. Notwithstanding that, the arraignment took place on the 5th floor of the police precinct because there was an altercation in the lobby of the 1st floor. At the time of the arraignment, Respondent had no documentary evidence of the charges and arraigned the defendant on “a warrant for marijuana” only. At the time, however, Respondent had been informed by Lt. Gary D. Hendrix of the fact there was a warrant for cocaine and heroin. This was not mentioned in the arraignment. Respondent fixed bond at $10,000, 10%. Bond was furnished by Attorney Culpepper and Defendant Spearman was released from custody and ordered to report the following day to fix a date for his preliminary examination.
Defendant Spearman absconded on bond and was not arrested until January 21, 1998, in St. Louis, Mo., and returned to this jurisdiction.
There was testimony that the ususal procedure on an arrest of this type was to detain the defendant and have *676 him arraigned the following morning before a circuit judge or magistrate. At that time, the police record and other information about the defendant and the crime would be available to have at the arraignment. Respondent also knew that Christine A. Kowal, Assistant Prosecuting Attorney, was on her way to attend the arraignment and also knew that Sgt. Dwane Blackmon was on his way with a copy of the defendant’s police record. Notwithstanding this, Respondent decided to go ahead with the arraignment because she had “waited long enough.” She said that she was aware of the federal charge and bond and felt that a larger bond was not required under these circumstances. Both Lt. Hendrix and Assistant Prosecutor Kowal advised that they had never experienced an arraignment such as this before a circuit judge in the police precinct. Other attorneys and police officers testified that they never knew of such a proceeding and it was against all accepted procedures find court rules.
On the basis of these findings, the commission reached the following conclusion:
The arraignment conducted by the Respondent at the 7th Precinct headquarters in People v Spearman was inappropriate in that it was contrary to all practice and procedure under court rules and contrary to the practice and custom in Wayne County. It was not conducted in court during normal business hours and was conducted without a prosecutor present. A questionable bond was established under the circumstances considering the crimes alleged. The entire procedure gave the appearance of impropriety, contrary to Canons 1, 2, and 3 of the Code of Judicial Conduct and MCR 9.205(A) and (C)(4).
B
The second case on which the commission’s recommendation for discipline is based is People v Crosse. *677 With regard to Crosse, the commission adopted the following findings:
Defendant Crosse, a middle-aged man who had retired to the Upper Peninsula, was charged with csc-i and csc-2 by a teen-age girl who was a former neighbor. It was agreed between defendant’s counsel and Respondent that the cases against defendant in Macomb County would be tried first. He was acquitted of the Macomb County charges and Respondent attempted to induce Defendant Crosse to waive a jury so that the case could be expedited. Defendant Crosse, however, insisted upon a jury trial and Respondent threatened to put him in jail if he did not waive the jury.
At approximately 11:00 a.m., April 28, 1997, when the case had not been called, defendant and his attorney left the courtroom, notifying the prosecutor that they were stepping out for a “cigarette” and would be available when the case was called. Shortly thereafter the case was called and when the defendant and his attorney were not immediately in the courtroom and ready to proceed, Respondent ordered a habeas issued for the arrest of both the attorney and defendant.
Within a few minutes, defendant appeared in the courtroom and Respondent had him arrested and detained in a restricted area of the courtroom. When defendant’s counsel returned, he was released. The trial did not start on that day, but on the following day, April 29, a jury was sworn and, again, the matter was adjourned until April 30, 1997, at 9:00 A.M. It was then adjourned to May 8, 1997, and continued on May 12, 1997.
Defendant’s attorney then filed a motion for a speedy trial to be heard on May 8, 1997. Respondent showed her anger at the hearing of this motion, and accused defendant’s counsel of “dishonesty” and cut him off from placing matters on the record. Her anger was apparent to all in the courtroom, and the matter appeared to be delayed solely because of defendant’s resistance to waive a jury.
This was obviously prejudicial conduct on the Bench, which was apparent to all who were in the courtroom.
*678 With respect to Crosse, the commission reached this conclusion:
Respondent’s conduct in the case of People v Crosse, wherein Respondent threatened to put defendant in jail if he did not waive his constitutional right to a jury trial, as well as questionable adjournments in view of defendant’s resistance to waive a jury, constituted a failure to properly perform Respondent’s judicial duties, as well as conduct prejudicial to the administration of justice, contrary to Canons 1, 2 and 3 of the Code of Judicial Conduct and MCR 9.205(A) and (C)(4).
C
The third basis for the commission’s recommendation of discipline is a problem noted in connection with Crosse — a remarkable pattern of adjourning cases and failing to attend in timely fashion to the business of the court. An example is the handling of a case called People v Ketchings. Here, the commission adopted the following findings of the master:
Defendant Retchings was one of four co-defendants accused in a shooting death of a 9-year old girl. Separate trials were set for the four defendants. Respondent tried the first three, who were convicted and given extended prison sentences. The Retchings matter was finally set for trial for December 9, 1996. The attorneys were ready for trial, efforts were made to negotiate a plea which were unsuccessful, and Respondent adjourned the trial until January 30, 1997. Both the attorneys were ready to proceed on that date. The matter was adjourned because Respondent said “She did not feel like hearing it” on that date and later recused herself. The attorneys then went to Chief Judge Michael Sapala, who attempted to induce the Respondent to try the matter but was unsuccessful. When the attorneys returned to the courtroom, Respondent recused herself on *679 the basis that she could no longer be impartial because she had tried the other three defendants. Both attorneys tried to persuade her to proceed with the trial since she would not be the trier of the facts and would only have to make rulings upon the evidence. Respondent refused to try it.
The case was thereafter assigned to Judge Harvey Ten-nen, who because of the substantial delay, was compelled to release Defendant Retchings pending trial. There had been no evidence that she was going to recuse herself or had even thought about it when she reset the case on December 9, 1996, to be tried on January 30, 1997, so another trial date was set.
Some of the problems with scheduling and finding that the case was adjourned were vividly set forth by Lisa Lindsey, Special Assignment, Assistant Prosecuting Attorney in the Retchings case.
“Well, the adjournments on the Retchings case, you have to take into combination with the other codefendants. All the witnesses were the same on each case, and as it relates to having witnesses who are cooperative, having witnesses who are available, it really impacted on the witnesses because the witnesses would come down. Even the police witnesses they would come down. They would be there and nothing — and it wouldn’t go. And the witnesses — I know specifically in the civilian witnesses, we had a lot of trouble with the civilian witnesses. We had to get bench warrants for the civilian witnesses in order to get them in.
“At some points, I was literally begging the witnesses to show up for the next hearing. The witnesses would curse me out, and it just — and then, you know, they would just— they would cuss — curse me out. I mean, you know, they’d be very profane, very upset. They’d complain that they were taking off from work, not getting paid. The victim’s mom, she was always very, very upset.
“And then you would have — when the witnesses would come down, every time the witnesses would be there, the defendant’s family and friends would be there, and there would always be a situation where in the hallways you would worry about whether a fight was going to break out between the victim’s family and the defendant’s friends and *680 family. They’d be out there wolfing [sic]. When I say wolfing, it’s a slang term, you know, for talking back and forth at each other and things of that nature. So it was difficult.”
These are clear violations of the statute and Canons of judicial conduct and prejudicial to the administration of justice.
In addition to the facts pertinent to Retchings, the master made additional findings regarding Judge Hathaway’s handling of her docket and her apparent pattern of absence. In this respect, the master relied on a report submitted in 1996 by Susan B. Boynton of the State Court Administrative Office. The contents of this report, which Ms. Boynton confirmed in her testimony at the hearing, included this:
Examination of the daily court sheets in the Systems Department at Recorder’s Court presents another possible theory for the increase in adjournments. For many days during the summer, all proceedings were adjourned and the judge’s signature was stamped at the bottom of the daily court sheets, not signed as required by the Recorder’s Court Docket Control Directive 93-5 (see attachment 2).[3] The same Directive requires the court clerk to indicate on the court sheet if the judge takes an unanticipated leave for vacation or illness. There were no indications on the court sheets in those months and no leave of any type reflected in *681 the Recorder’s Court official attendance record [4] for Judge Hathaway during those months.
If judicial leave cannot explain the high number of days when all or most of the proceedings were adjourned, then the possibility exists that Judge Hathaway was choosing not to do the scheduled work in her courtroom. For example, June, 1996 had 20 working days. The court sheets are missing for two days, six days had all matters adjourned and four days had most proceedings adjourned. Trial activity occurred on three days during the month, resulting in one guilty verdict and one mistrial.
August, 1996 shows a similar pattern of work habits. No official leave is recorded, yet nine of the 19 working days on the court sheets showed that all matters were adjourned and on another two days most matters were adjourned. There was no trial activity in August other than a plea at a scheduled jury trial.
In light of the facts pertaining to Retchings and Judge Hathaway’s more generalized failure to perform the duties of office, the commission reached this conclusion:
Respondent’s constant and repeated adjournments of proceedings without good cause, as exemplified in the case of People v Retchings, as well as repeated unnecessary and unexcused absences from judicial responsibilities during normal court hours were inappropriate. Likewise, Respondent’s overall lack of industry and proper management of her court docket as well as an unwillingness to take corree-' tive action or accept constructive suggestions or assistance to improve case management, constituted a hindrance to the administration of justice and gave the appearance of impropriety, all contrary to Canons 1 and 3 of the Code of Judicial Conduct and MCR 9.205(A) and (C)(2) and (4).
*682 D
The overall conclusion of the commission was that Judge Hathaway “has committed misconduct in office, in violation of MCR 9.205(C), and violated the provisions of Canons 1, 2, and 3 of the Michigan Code of Judicial Conduct.” Without additional explanation, the commission then recommended that this Court accept its findings of judicial misconduct and impose a thirty-day suspension without pay.[5]
ii
In lieu of acting upon that recommendation, we remanded this case to the commission “for the articulation of standards of judicial discipline, and the application of those standards to the instant case, in order that this Court can meaningfully carry out its powers of judicial review under Const 1963, art 6, § 30(2). See In re Brown, [461 Mich 1291 (2000)].” 461 Mich 1296 (2000).
On remand, the commission renewed its recommendation of a thirty-day suspension without pay. The commission did not provide further elaboration of its reasoning, noting that “the composition of the Commission has changed substantially” since its initial recommendation. The commission added:
In the future the Commission will, to the extent possible, cite additional factors which may facilitate the Supreme Court’s review of sanctions imposed by the Commission.
*683 This Court then placed the case on its calendar,[6] and directed the parties to brief the issue “whether the proposed suspension of thirty days without pay is sufficient discipline in this case.” 463 Mich 1201 (2000).
m
The Judicial Tenure Commission was established in 1968 when the people of Michigan amended the constitution to add a § 30 to article 6. When the commission comes to this Court with a recommendation for discipline, it invokes the Court’s jurisdiction under Const 1963, art 6, § 30(2), which provides:
On recommendation of the judicial tenure commission, the supreme court may censure, suspend with or without salary, retire or remove a judge for conviction of a felony, physical or mental disability which prevents the performance of judicial duties, misconduct in office, persistent failure to perform his duties, habitual intemperance or conduct that is clearly prejudicial to the administration of justice. The supreme court shall make rules implementing this section and providing for confidentiality and privilege of proceedings.
Under this Court’s constitutional authority to make rules implementing Const 1963, art 6, § 30, we promulgated GCR 1963, 932 in early 1969.[7] 381 Mich lxxxiii (1969). When the General Court Rules of 1963 were replaced in 1985 by the Michigan Court Rules, the provisions of GCR 1963, 932 were placed in sepa *684 rate rules within subchapter 9.200. 419A Mich 552-569 (1985).
When this Court receives a disciplinary recommendation from the commission, it has authority to “censure, suspend with or without pay, retire or remove” a judge.[8] Const 1963, art 6, § 30(2). On receipt of such a recommendation, this Court undertakes a de novo review of the matter. In re Ferrara, 458 Mich 350, 358; 582 NW2d 817 (1998). This review occurs whether or not the respondent judge files a petition with this Court. MCR 9.224(A), (C).
In 1969, when this Court exercised its constitutional rulemaking authority under Const 1963, art 6, § 30 by implementing GCR 1963, 932, we included this subrule:
The Supreme Court shall review the record of the proceedings on the law and facts and shall file a written opinion and judgment directing censure, removal, retirement, suspension, or other disciplinary action as it finds just and proper, or reject or modify, in whole or in part, the recommendations of the commission. [GCR 1963, 932.25.]
That subrule was not amended until 1985, when it was replaced by MCR 9.225:
The Supreme Court shall review the record of the proceedings and shall file a written opinion and judgment *685 which may direct censure, removal, retirement, suspension, or other disciplinary action, or reject or modify the recommendations of the commission.
The court rule states our authority to modify a recommendation of the commission, and the meaning of the word “modify” encompasses authority to alter the recommended discipline. Random House Webster’s College Dictionary defines “modify” as follows:
[T]o change somewhat the form or qualities of; alter partially; amend; to modify a contract. [Random House Webster’s College Dictionary 843 (2d ed 1997).][9]
Our respect for the judgment of the men and women who have served on the commission is substantial, and to date we have not had occasion to increase the discipline recommended for a respondent judge — we likewise anticipate that few such occasions will arise in the future. Yet our authority to increase the recommended discipline is clear.[10]
*686 That we have authority to alter the recommended discipline is bolstered by the persuasive decision of the Washington Supreme Court in In re Disciplinary Proceeding against Anderson, 138 Wash 2d 830; 981 P2d 426 (1999).Working from a similar grant of constitutional authority,[11] the Washington Supreme Court considered a recommendation from the state’s Com *687 mission on Judicial Conduct[12] that a judge be suspended without pay for four months and required to take a specified “course of corrective action.” 138 Wash 2d 840. For reasons stated at length by the Washington Supreme Court, it decided instead to remove the judge from office. 138 Wash 2d 854. With regard to its authority to take such action, the Washington Supreme Court explained:
This court reviews judicial disciplinary proceedings de novo. In re Discipline of Deming, 108 Wash 2d 82, 87-89; 736 P2d 639; 744 P2d 340 (1987). De novo review of judicial disciplinary proceedings requires an independent evaluation of the record as the court is not bound by the Commission's findings or conclusions. In re Discipline of Turco, 137 Wash 2d 227, 246; 970 P2d 731 (1999). De novo review does not mean that the Supreme Court conducts a new evidentiary hearing. Rather, this court must independently determine if the judge violated the Code of Judicial Conduct, and, if so, the proper sanction to be imposed. Id. The Commission bears the burden of proving factual findings by clear, cogent, and convincing evidence. Id. In evaluating the evidence, we necessarily give considerable weight to credibility determinations by the Commission, as the body that had the opportunity directly to observe the witnesses and their demeanor. Id. Additionally, we give serious consideration to the Commission’s recommended sanctions. In re Discipline of Ritchie, 123 Wash 2d 725; 870 P2d 967 (1994). Nevertheless, the Commission’s recommendation is just that. The constitution’s use of the word “recommend” indicates an intent to place the ultimate decision to discipline in the Supreme Court. Deming, 108 Wash 2d at 88. [138 Wash 2d 843 (emphasis supplied).]
*688 IV
We explained in Ferrara that “[o]ur primary concern in determining the appropriate sanction is to restore and maintain the dignity and impartiality of the judiciary and to protect the public.” 458 Mich 372. Thus, we chose a course of discipline that was “based on the nature, extent, and frequency of the misconduct.” 458 Mich 373.
Earlier, we had said this in In re Hocking, 451 Mich 1, 24; 546 NW2d 234 (1996):
In assessing the appropriate sanction in judicial disciplinary proceedings, our primary charge is to fashion a penalty that maintains the honor and the integrity of the judiciary, deters similar conduct, and furthers the administration of justice. See In re Seitz, 441 Mich 590, 624; 495 NW2d 559 (1993).
In this Court’s Brown decision, we listed the following standards, though not an exhaustive list, that the JTC shall consider in making its recommendation:
(1) misconduct that is part of a pattern or practice is more serious than an isolated instance of misconduct;
(2) misconduct on the bench is usually more serious than the same misconduct off the bench;
(3) misconduct that is prejudicial to the actual administration of justice is more serious than misconduct that is prejudicial only to the appearance of propriety;
(4) misconduct that does not implicate the actual administration of justice, or its appearance of impropriety, is less serious than misconduct that does;
(5) misconduct that occurs spontaneously is less serious than misconduct that is premeditated or deliberated;
(6) misconduct that undermines the ability of the justice system to discover the truth of what occurred in a legal controversy, or to reach the most just result in such a case, *689 is more serious than misconduct that merely delays such discovery;
(7) misconduct that involves the unequal application of justice on the basis of such considerations as race, color, ethnic background, gender, or religion is more serious than breaches of justice that do not disparage the integrity of the system on the basis of a class of citizenship. [Brown, supra at 1292-1293 (2000).]
In its Anderson decision, the Washington Supreme Court elaborated on similar criteria.[13]
In the present case, we cannot agree with the commission that a thirty-day suspension without pay is sufficient discipline. Applying the Brown standards to the instant case, we believe that the course of sustained judicial misconduct that this record reveals requires stronger disciplinary action than the thirty-day suspension without pay that Judge Hathaway consented to and which the JTC recommended to this Court. In particular, we conclude that Judge Hathaway’s protracted refusal to attend to her judicial duties has worked an injustice, not only upon the defendants charged with crimes who had every legiti *690 mate expectation that their cases would be handled expeditiously by the court, but also the witnesses in those matters, the very people on whom our system of justice depends. The repeated unexplained adjournments of matters pending before Judge Hathaway have worked an injury upon the public and potentially contributed to the increasing cynicism about our judicial system, its efficacy and fairness.
The circumstances of the arraignment in Spearman were utterly irregular. The confusion regarding the charges against Mr. Spearman and regarding the advisability of facilitating his release were the direct result of Judge Hathaway’s inexplicable decision to place the interests of Mr. Spearman and his counsel, Mr. Culpepper, ahead of all other interests, including protection of the public. We employ the term “inexplicable” advisedly, since no remotely convincing explanation has yet been tendered for the handling of the Spearman arraignment, nor can we imagine one.
The improper effort to persuade Mr. Crosse to waive his right to a jury trial is another example of a serious one-time breach of Judge Hathaway’s responsibility to use her judicial power lawfully. However, it surely was connected to a more serious problem that was ongoing — her prolonged failure to attend in timely fashion to the business of her court.
Retchings was chosen by the commission as an example of a case in which Judge Hathaway’s refusal to do her work caused profound suffering for the family of the victim and outrageous inconvenience for the witnesses. However, it is only an example. The record of this case amply demonstrates the remarkable extent of Judge Hathaway’s failure to discharge her judicial duties. We are not talking here of a failure *691 to move papers or to file administrative reports. Nor are we talking about a judge having “a bad day” — or several. Rather, this disciplinary proceeding concerns a judge who has simply declined over an extended period to do her work.
Again citing Retchings only as an example, the record reflects twenty-one adjournments, five initiated by the defense, none by the prosecution, and sixteen by the court. After all this, the parties gathered for trial on January 30, 1997, only to be advised by Judge Hathaway that another adjournment would occur because “I just don’t feel like doing it.” Judge Hathaway then inexplicably recused herself from the case, causing still more delay. The assistant prosecutor described the mother of the nine-year-old victim as “devastated” by the events of January 30. This record establishes, if not a pattern of deliberate misconduct, capricious conduct shockingly lacking in appropriate judicial deliberation.
This is indefensible conduct. A judge’s whimsical decision whether to work on a particular day, or during particular months, cannot take precedence over the affairs brought to the courthouse by the people for resolution.
As with Spearman, we are further troubled by the absence of any plausible explanation for this conduct. Judge Hathaway generally denies excessive absences, and relies on the fact that her docket is reported to be current at this time. Absent some understanding of why these problems occurred, or even a direct acknowledgment that such a situation existed, we see *692 no reasonable basis for assuming that these problems are safely behind her.[14]
For these reasons, we disagree with the jtc’s recommendation that respondent be suspended only thirty days without pay. In our judgement, the conduct of respondent is deserving of far more serious discipline that is in keeping with severity of the breach of standards of judicial conduct demonstrated in this record. The discipline sanction should (1) first and foremost impress upon the respondent the severity and significance of her misconduct and (2) serve as a strong motivation to deter her from future misconduct. Highly relevant to our determination is the fact that Judge Hathaway has never on this record acknowledged the nature of her misconduct, or the deleterious effect that it has had on the persons who appeared before her, or on the public’s perception of the judiciary.
We conclude that our disciplinary goals will be best served if Judge Hathaway is suspended without pay for a period of six months.[15]
*693 v
The dissent contends that this Court does not have the constitutional authority to increase the discipline recommended by the jtc. In fact, the dissent suggests that to do so violates our duty to the constitution. We believe, to the contrary, that the dissent’s position is inconsistent with the constitution. The dissent’s view results in partial “immunization” of jtc decisions from accountability to any elected branch of government and is contrary to the central organizing principle of constitutional government-control by the citizens, either indirectly (election of legislators, executive or judicial officers all of whom are accountable for their actions and the actions of their agents) or directly (initiative or referendum) of all aspects of government. Under the dissent’s approach, the jtc, selected not by the people but by lower court judges, the State Bar of Michigan, and the Governor,[16] could conceivably give mild wrist slaps to seriously misbehaving judges, and no one that reports directly to the people, no member of this Court, no legislator, and no Governor could do a thing about it. Such a departure from fundamental constitutional theory, namely, a departure from electoral accountability, should be a power found only if very clearly stated in the constitution. We do not have that situation here. Indeed, the dissent’s position can only be attained by torturing the *694 definition of the word “modify,” suggesting that it only means a downward departure.
This is an interesting position for the author of the dissent to advocate, given that only six months ago he voted to increase a jtc recommended sanction, see In re Runco, 463 Mich 517, 518; 620 NW2d 844 (2001), the very thing he today says is constitutionally forbidden. In that matter, Judge Runco was brought before this Court by the jtc with the recommendation being a censure. We affirmed. Justice Cavanagi-i, however, in dissent effectively asserted that the sanction be “modified” upward from a censure to thirty days, id. at 524, a penalty, not to belabor the obvious, that was considerably more severe than that recommended by the jtc.
As to the dissent’s analysis, after deconstructing the definition of the word “modify” to claim it only allows a downward departure (see n 9), it then urges that the language “[o]n recommendation of the judicial tenure commission” suggests that “[t]his Court’s actions in judicial discipline cases that are not ‘on recommendation’ of the jtc are actions . . . not authorized by the constitution.” Post at 700. However, the dissent’s argument is effectively undermined by its further insistence that an increase from the jtc’s recommended discipline is not “on recommendation” of the JTC, but that a decrease from the jtc’s recommended discipline is “on recommendation” of the JTC. We do not understand how the dissent can, consistent with the constitution, vote in support of a decrease in the discipline recommended by the jtc,[17] yet maintain *695 that it is unconstitutional for this Court to increase the jtc’s recommended discipline.[18]
Indeed, consistent with Justice Cavanagh’s own voting record, we are convinced that the phrase “on recommendation” is an expression on how the judicial discipline process is initiated. Once the jtc makes a recommendation of discipline, this Court may accept or reject that recommendation. Inherent in our authority to reject a jtc recommendation is the option to decide the appropriate discipline to impose, whether it be an affirmance, a reduction, or an increase in the recommendation of the jtc.[19]
It is also noteworthy that the dissent has no response to the anomalous situation, identified in note 10, in which this Court would find itself if “modify” were interpreted only to refer to a downward *696 change in sanction. We would be precluded in many instances from achieving both equivalence and proportionality in our sanctions, instead necessarily having to subordinate one of these fundamental judicial values in favor of the other. In fact, the most that can be argued by one holding the position that no upward departure is constitutionally allowed — and it has been said by none other than Justice Cavanagh himself — is that increasing the recommended suspension has “never directly [been] addressed by this Court before” (except of course, in Justice Cavanagh’s dissent in Runco). See 463 Mich 1201 (2000). This case presents a question of original impression, rather than as the dissent would characterize it, a departure from an unbroken line of cases for thirty-three years that have held contrary to today’s majority. Only if “modify” is accorded the meaning adopted by the majority can this Court simultaneously achieve both of these indispensable ends.
Finally, we could not disagree more with the dissent that Judge Hathaway was not aware of the possibility that “the harshest discipline” she might face may go beyond that recommended by the JTC. Post at 710. Judge Hathaway fully contested the charges at every level available to her at the JTC. In this Court’s July 26, 2000, order directing that this case be placed on the calender for oral argument and also directing the parties to address the sufficiency of the recommended discipline, Judge Hathaway was fully apprised that she might face an increased sanction from that recommended by the JTC. See 463 Mich 1201 (2000). Even in the dissenting statement prepared by Justice Cavanagh, when this matter was set for oral argument, Judge Hathaway was provided with further *697 notice of the possibility that this Court might not believe a thirty-day suspension is justifiable and that increased sanctions might be forthcoming. Here is what Justice Cavanagh said:
I can only assume that implicit in this Court’s order is the issue whether this Court has the authority to increase any discipline recommended by the Judicial Tenure Commission, an issue of great significance and one never directly addressed by this Court before. 463 Mich 1201 (2000). Id.
Indeed, Judge Hathaway’s brief addressed the issue whether this Court had the authority to increase the recommended suspension and the issue was explored further when we heard oral argument. We believe that there was no question that Judge Hathaway was aware of the potential for an increased sanction from that recommended by the jtc.
For these reasons, we do not agree with the dissent.
Pursuant to MCR 7.317(C)(3), the Clerk is directed to issue the judgment order forthwith.
Corrigan, C.J., and Taylor, Young, and Markman, JJ., concurred.
Weaver, J. I concur in the result and the reasoning of parts I through iv of the majority opinion.

 MCR 9.210, 9.215.

 The master further found that Judge Hathaway had committed judicial misconduct in her dispositive rulings in several cases that are not discussed in this opinion. The commission rejected those findings, explaining:
Based on the record before us, the decision-making by the judge in these specific cases is not a matter for a determination of judicial misconduct by the jtc. It is not the responsibility of the jtc to function as an appellate court nor can erroneous decisions by a judge made in good faith and with diligence be grounds for judicial misconduct. MCR 9.203(B).

 Docket Control Directive: DCD No. 93-5
Date: February 1, 1993
Re: Maintenance of Records on Court Sheets
1. Each judge shall personally sign the court sheets recording each day’s activity.
2. If the judge takes an unanticipated leave for vacation or illness, it should be indicated by the court clerk on the court sheet. If the judge comes in and leaves because of illness or other business, that should also be indicated on the court sheet.
3. In the absence of a judge on pretrial day, a court clerk may not set subsequent proceeding dates and indicate on the court sheets that pretrial was held.

 The record of this case does not contain the “official attendance record.”

 Eight of the nine commission members heard this matter. Ail eight concurred in the recommendation.

 MCR 9.224(C), (F).

 We earlier had promulgated GCR 1963, 931 as a transitional rule. 381 Mich lxxxii (1968).

 Independent of Const 1963, art 6, § 30, which the people of Michigan added to the constitution in 1968, this Court has general superintending control of all Michigan courts. Const 1963, art 6, § 4. This provision is a broad grant of constitutional authority to take necessary action, short of the outright removal of a judge. See In re Probert, 411 Mich 210, 229-233; 308 NW2d 773 (1981). See also In re Huff, 352 Mich 402; 91 NW2d 613 (1958) and the discussion of Huff by the framers of the 1963 constitution. 1 Official Record, Constitutional Convention 1961, pp 1269-1287. In the present case, there is no need to explore the nature or dimensions of this Court’s authority under Const 1963, art 6, § 4.

 The dissent purports to rely upon two dictionary definitions that seemingly restrict the meaning of “modify” to its “limiting” sense. Both of the dictionaries the dissent references, however, include the definition of “modify” we rely upon here.

 There is no indication that the use of the term “modify” was intended to permit or preclude this Court from altering the recommended discipline so as to adequately address the nature of the ethical infraction at issue. Illustratively, the term “modify”, if construed to mean that this Court could only reduce a sanction recommended by the jtc, would, in our judgment, deny this Court the ability to fairly and effectively carry out its obligations under MCR 9.225 to “review” the jtc’s record and to file a “written opinion and judgment” in accord with that review. As we recently observed in an order of remand to the JTC:
The most fundamental premise of the rule of law is that equivalent misconduct should be treated equivalently ... it is the burden of the jtc to persuade this Court that it is responding to equivalent cases in an equivalent manner and to unequivalent cases in a proportionate manner. In other words, to demonstrate that *686 there is a consistently enforced system of judicial discipline in Michigan.
* H: H=
The importance of such standards is both in ensuring that the jtc is consistent in its consideration of factors relevant to the level of sanctions, and in enabling this Court, by its constitutional obligation, to meaningfully review the jtc’s recommendations. [In re Brown, 461 Mich 1291, 1292 (2000).]
Just as there is an obligation upon the jtc, derived from the fundamental “rule of law”, to sanction in an equivalent and proportionate manner, so too does this Court have such an obligation under MCR 9.225. Satisfying this obligation would not be possible if this Court could only “modify” the recommended sanctions of the jtc in a downward manner. Unless “modify” is given its ordinary meaning, to change or to alter, the simultaneous pursuit of equivalence and proportionality in this Court’s review of the recommendations of the jtc, would, in many cases, be unattainable. Because we do not believe that these objectives are in tension with one another, or that there are occasions on which we should be constrained by one from achieving the other, “modify” is properly interpreted, in our judgment, to enable either upward or downward changes in the recommendations of the jtc.

 Upon the recommendation of the commission, the supreme court may suspend, remove, or retire a judge or justice. The office of a judge or justice retired or removed by the supreme court becomes vacant, and that person is ineligible for judicial office until eligibility is reinstated by the supreme court. The salary of a removed judge or justice shall cease. The supreme court shall specify the effect upon salary when it suspends a judge or justice. The supreme court may not suspend, remove, or retire a judge or justice until the commission, after notice and hearing, recommends that action be taken, and the supreme court conducts a hearing, after notice, to review commission proceedings and findings against the judge or justice. [Wash Const, art 4, § 31(5).]

 As in Michigan, the Washington commission is itself a creature of the constitution. Wash Const, art 4, § 31(1).

 In determining the appropriate sanction for judicial misconduct, the court considers:
(a) whether the misconduct is an isolated instance or evidenced a pattern of conduct; (b) the nature, extent and frequency of occurrence of the acts of misconduct; (c) whether the misconduct occurred in or out of the courtroom; (d) whether the misconduct occurred in the judge’s official capacity or in his private life; (e) whether the judge has acknowledged or recognized that the acts occurred; (f) whether the judge has evidenced an effort to change or modify his conduct; (g) the length of service on the bench; (h) whether there have been prior complaints about this judge; (i) the effect the misconduct has upon the integrity of and respect for the judiciary; and Q) the extent to which the judge exploited his position to satisfy his personal desires. Deming, 108 Wash 2d at 119-120. [138 Wash 2d 854-855.]

 Indeed, the only Brown criterion not implicated in this record is criterion seven. There is no evidence that any of Judge Hathaway’s actions or inactions were predicated upon consideration of race, sex or any other impermissible characteristic.

 Likewise, in In re Moore we ordered that Judge Moore be suspended for a period of six months without pay. We recognize that the Brown standards, as applied to the conduct of Judges Hathaway and Moore, support proportionate sanctions. A six-month suspension without pay is justified in Moore because of Judge Moore’s pattern of misconduct extending over a period of twenty years. Though Judge Hathaway’s misconduct occurred over a shorter period of time in comparison to that of Judge Moore, we believe a six-month suspension is justified because of the troubling nature of Judge Hathaway’s conduct. Accordingly, the misconduct engaged in by both Judges Hathaway and Moore are equally deserving of a six-month sanction.

 Pursuant to Const 1963, art 6, § 30, the jtc has nine members, one Court of Appeals judge elected by the Court of Appeals judges, one circuit judge elected by the circuit judges, one probate judge elected by the probate judges, one district court judge elected by the district judges, three members elected by the state bar of whom one shall be a judge and two shall not be judges, and two members are appointed by the Governor who shall not be judges, retired judges or members of the state bar.

 See In re Simmons, 444 Mich 781; 513 NW2d 425 (1994). In Simmons, this Court rejected the commission’s recommendation of a public censure and did not impose any punishment.

 The dissent’s theory of what “on recommendation” means can only be described as a “ratchet construction” — one that proceeds in only one direction. The dissent urges that the Mikesell matter, in which this Court rejected the JTC’s recommendation of permanent removal in favor of a time-limited suspension, was nonetheless a decision made “on recommendation” “because the more severe discipline, or more bases of misconduct, recommended by the jtc necessarily include lower levels of discipline and the bases of misconduct recommended, but not accepted.” Post at 701, n 1 (emphasis added).
Apart from the fact that this explanation has a certain impenetrable Mice in Wonderland logic about it, and leaving aside that judicial discipline jurisprudence recognizes no “lesser included offenses,” the dissent’s argument is internally inconsistent. If this Court rejects the jtc recommendation and inteiposes a lower level of discipline, the Court has not acted on the recommendation as the dissent contends. On the contrary, if the dissent’s argument were truly consistent, then when, as in Mikesell, this Court rejects some of the bases for discipline the jtc relied upon, the Court would then be obligated to remand the case to the JTC for a new recommendation concerning the remaining acts of misconduct. Neither the dissent nor this Court has interpreted the Const 1963, art 6, § 30(2) in this fashion and nothing in that provision compels such a construction.

 The dissent’s position would also preclude this Court from being able to ensure fairness and proportionality across discipline cases. See footnote 10.