# Order

**Michigan Supreme Court**
**Lansing, Michigan**

February 6, 2008

134481 & (4)

In re:

The Honorable Norene S. Redmond          SC: 134481
Judge, 38th District Court
Eastpointe, Michigan

_____/

Clifford W. Taylor,
Chief Justice

Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman,
Justices

On order of the court, the Judicial Tenure Commission has issued a Decision and Recommendation for Discipline, and the Honorable Norene S. Redmond has consented to the Commission's finding of fact and its recommendation for discipline.

As we conduct our de novo review of this matter, we are mindful of the standards set forth in *In re Brown*, 461 Mich 1291, 1292-1293 (2000):

[E]verything else being equal:

(1)     misconduct that is part of a pattern or practice is more serious than an isolated instance of misconduct;

(2)     misconduct on the bench is usually more serious than the same misconduct off the bench;

(3)     misconduct that is prejudicial to the actual administration of justice is more serious than misconduct that is prejudicial only to the appearance of propriety;

(4)     misconduct that does not implicate the actual administration of justice, or its appearance of impropriety, is less serious than misconduct that does;

(5)     misconduct that occurs spontaneously is less serious than misconduct that is premeditated or deliberated;

(6)     misconduct that undermines the ability of the justice system to discover the truth of what occurred in a legal controversy, or to reach the most just result in such a case, is more serious than misconduct that merely delays such discovery;

(7)    misconduct that involves the unequal application of justice on the basis of such considerations as race, color, ethnic background, gender, or religion are more serious than breaches of justice that do not disparage the integrity of the system on the basis of a class of citizenship.

The JTC should consider these and other appropriate standards that it may develop in its expertise, when it offers its recommendations.

In this case those standards are being applied to the following findings of the Judicial Tenure Commission, which we adopt as our own:

1.    Respondent is, and at all material times was, a judge, of the 38th District Court in Eastpointe, Michigan.  With respect to Grievance No. 06-16451, Respondent was sitting as a judge of the 41A District Court (Shelby Township) acting pursuant to Joint Local Administrative Order D37 2005-01J.    As a judge, she is subject to all the duties and responsibilities imposed on her by the Michigan Supreme Court, and is subject to the standards for discipline set forth in MCR 9.104 and MCR 9.205.

**Grievance No. 2006-16451**

2.    On January 14, 2006, Jeannine Somberg's 16-year-old son, Nicholas, called 911 and reported that his mother hit him with a belt.  The Shelby Township Police responded and noticed Nicholas had a red welt on his left arm.  Nicholas refused to sign a statement.

3.    Ms. Somberg, who was outside when the police arrived, was uncooperative with one of the officer's attempts to have her go inside. When the officer tried to arrest her, she ran into the house and locked herself and her 12-year-old autistic son in the bathroom.  She eventually exited the bathroom.  The Shelby Township officers arrested her for domestic violence and for resisting arrest and obstruction of justice.  The misdemeanor domestic violence charge carried a maximum sentence of 93 days and the felony resisting arrest and obstruction of justice charge carried a maximum of two years prison.

4.    The following day, Sunday, January 15, 2006, Respondent presided over a bond hearing for Ms. Somberg, who was unrepresented.  Respondent set bond at $5,000.00/10%.  Ms. Somberg, who had been transferred within the Macomb County Jail complex, awaited release upon her parents' payment of $500.

5.    After the bond hearing, there was a disturbance in the adjacent hallway.  Ms. Somberg's 16-year-old son Nicholas referred to Respondent as an "asshole" out of the presence of Respondent and his mother.  A law enforcement official relayed the incident to Respondent, who promptly

went back on the record, approximately 15 minutes after the bond hearing had ended. Respondent then raised Ms. Somberg's bond to $25,000.00 cash/surety without knowledge or presence of Ms. Somberg, and without citing MCR 6.106(H)(2)(a):

> THE COURT: This is the matter of Jeannine Lucido Somberg. Miss. [sic] Somberg had been before me this morning on a domestic violence case, involving her son, her 16 year old [sic] son who was in the courtroom along with family members. I took the appropriate information set a conditional bond, and given the nature of what she told me, regarding a special needs son, I set the bond at $5,000.00, 10 percent.
>
> Upon the bond being set, in the hallway, it came to my attention that there was an incident involving the sheriff's department and Shelby Township Police Officers, in which the alleged victim in this matter, was threatening in his manner and tone, along with other family members, and the 16 year old — was it the — the 16 year old [sic] proceeded to call me an asshole, in the officer's presence, which then was brought to my attention as well. And given the circumstances in this matter, and given the possible violent, and assaultive nature, not only of the alleged victim, the family and the Defendant, the bond will be $25,000.00 cash surety only. All other terms and conditions apply.

[5a]. Respondent initially set bond for Ms. Somberg in the amount of $5,000.00/10%. Minutes after Ms. Somberg had been removed, Ms. Somberg's 16-year-old son Nicholas was overheard in the hallway referring to Respondent as an "asshole" by county officials, who reported the incident to Respondent. Respondent went on the record 15 minutes after the bond hearing had concluded and increased Ms. Somberg's bond to $25,000.00 cash or surety, referring to the "asshole" comment. Ms. Somberg's parents had already gone to pay the original $500.00 bond to get her released, learned it had been changed to a $25,000.00 cash bond and returned to court. Approximately half an hour later, Respondent went on the record again with Ms. Somberg's parents and son present. Nicholas Somberg acknowledged he was the one at fault, and repeatedly asked to be punished instead of his mother, either by being jailed or placed in juvenile detention until Tuesday. Respondent castigated him for his behavior but did not lower the bond or reinstate the original bond.

[5b]. Respondent asserted her decision to increase the bond was to "protect" the family from potential domestic violence. She had, however,

already issued a no contact except for mental health order between Ms. Somberg and Nicholas.

6. At trial, a jury found Ms. Somberg not guilty of the underlying charge of domestic violence, but guilty of resisting and obstructing.

**Grievance No. 2006-16509**

7. James Braun was charged with two felonies: embezzlement from a vulnerable adult and larceny in a building, along with Isaac Lovell. The men had taken about $800 in cash from the premises and had given an inflated estimate for a painting job to a 90-year-old woman. The woman paid them approximately $3,000.00, which was excessive for the amount of work done.

8. The maximum sentence for the embezzlement count is 5 years and/or $10,000.00. The maximum sentence for the larceny count is a maximum of four years and/or $5,000.00.

9. On June 29, 2005, Respondent arraigned James Braun in 38th District Court.

10. There were television cameras in the courtroom.

11. Mr. Braun's attorney, George Michaels, pointed out that Mr. Braun had no prior adult or juvenile criminal record, no history of substance abuse or addiction, had recently moved with his parents and wife to Ortonville, Michigan, and would likely be sentenced to probation. He accordingly asked for a low bond to be set. Mr. Braun provided Respondent with his recently obtained Michigan telephone number, but had not yet changed his driver's license from Florida to Michigan.

12. Eastpointe Police Department Detective Neil Childs stated that the Police Department felt anyone who would take advantage of a 90-year-old is a threat to the public, that the Police Department did not believe that Mr. Braun had ties to the area because he gave the police officers a North Fort Myers, Florida address and that Ortonville is not considered close, and that the vehicle Mr. Braun was riding in with the co-Defendant had work orders from Delaware. Detective Childs asked for the highest possible bond that the Court felt was appropriate.

13. Respondent set bond for Mr. Braun at $750,000.00.

14. After the matter went to Circuit Court, the embezzlement-from-a-vulnerable-adult and larceny-in-a-building charges against Mr. Braun were dropped pursuant to a plea agreement. He pled no contest to a charge of false pretenses and was sentenced to one year probation with credit for 12 days served.

15. Isaac Lovell was charged with two felonies: embezzlement from a vulnerable adult and larceny in a building, along with James Braun. The men had taken about $800 in cash from the premises, and had given an inflated estimate for a painting job to a 90-year-old woman. The woman paid them approximately $3,000.00, which was excessive for the amount of work done.

16. The maximum sentence for the embezzlement count is 5 years and/or $10,000.00. The maximum sentence for the larceny count is a maximum sentence of four years and/or $5,000.00.

17. On June 29, 2005, Respondent arraigned Isaac Lovell. Mr. Lovell's attorney, Michael J. Dennis, pointed out that Mr. Lovell had a minimal prior criminal history, was married, had an 11-month-old child, and had recently established ties with the community of Ortonville, Michigan, having purchased a mobile home where he and his family lived in a trailer park in a mobile home he had purchased.

18. Eastpointe Police Department Detective Neil Childs pointed out that Mr. Lovell's criminal history dated back to 1996 in Florida for driving while license suspended, 1998 (Osceola County) for domestic violence battery, 2001 (Pinellas Park Police) for driving while license suspended, an obstruction charge for failing to appear on the driving while license suspended, 2004 for driving while license suspended in Orange County, and 2004 driving under the influence and driving while license suspended. On behalf of the Eastpointe Police Department, Detective Childs said that they had to assure the alleged victim that she and the other residents of the state that they will be protected [sic]. Detective Childs pointed out that Mr. Lovell have [sic] given an out-of-state address to the officers. Detective Childs expressed concerns about Mr. Lovell's ties to the area and whether or not he would return to court. Detective Childs also pointed out that Mr. Lovell appeared in the NABI ("National Association of Bunco Investigators") book, by name, picture, and date of birth as a "traveler" who has had contact with this type of activity at some point in his past.

19. Respondent set bond for Mr. Lovell at $1,000,000.00.

[19a]. Respondent's comment, in response to Mr. Braun's attorney's observation that considering all the circumstances his client would undoubtedly get probation, to the effect that it was a shame if convicted that that was the case, contributed to the appearance that the grossly excessive bails she set for Mr. Braun ($750,000) and Mr. Lovell ($1,000,000) were intended to be punitive.

20. After the matter went to circuit court, the embezzlement-from-a-vulnerable-adult and larceny-in-a-building charges against Mr. Lovell were

dropped pursuant to a plea agreement. He pled no contest to a charge of false pretenses and was sentenced to one year probation with credit for 12 days served.

**Grievance Nos. 2006-16771 and 2007-16812**

21. Carmen Granata, a 23-year-old veterinarian technician, was cited on November 5, 2006, for violating the city noise ordinance.

22. Ms. Granata admitted hosting a large party. After attending a concert some of the guests returned. Neighbors called the police to complain about the noise. The police initially did not observe any violations but advised Ms. Granata about the complaints. Some time around 4:00 a.m., one of the guests went outside to use a cell phone, and yelled or spoke loudly. The police, who were waiting in a car down the street, approached and ticketed Ms. Granata.

23. On November 21, 2006, Ms. Granata appeared before Respondent in *pro per*. She pled guilty to the misdemeanor noise violation. Ms. Granata had no prior criminal record. The maximum penalty for the ordinance violation was 90 days and/or $500.00.

24. During the hearing, Respondent read a petition from certain of Ms. Granata's neighbors who complained about the parties and the number of guests who frequented Ms. Granata's house, allegedly causing disturbances. Respondent did not disclose that she knew some of the neighbors. Respondent also read favorable letters from certain of Ms. Granata's neighbors into the record.

25. Respondent allowed three of Ms. Granata's neighbors who had signed the petition, Jeffrey and Melissa Walsh, and Richard Jordan to speak out about their past experiences with Ms. Granata. Respondent does not contest that Richard Jordan was himself arrested in front of Ms. Granata's house for disorderly conduct and resisting arrest the night she was ticketed. Neither Mr. Jordan nor law enforcement officials disclosed this fact to Respondent on the record.

26. Respondent referred to Ms. Granata's neighbors as "the people who built this damn city" and agreed with one of them, "I wouldn't be scared of them either. They're just punks." Respondent repeatedly referred to Ms. Granata's residence as a "flophouse" and how she would be "livid" by the alleged activity.

27. Respondent imposed a sentence upon Ms. Granata which included fines and costs and two years reporting probation with the first 30 days served in the Macomb County Jail, and several other strict terms, including, but not limited to, reporting twice monthly, daily preliminary breath tests at the police department and 38th District Court, subjection to home visits, 100

hours of community service, no parties unless approved by the neighbors who signed the petition, and no one to spend the night at her home except Ms. Granata and her brother who reside there.

[27a]. Notwithstanding the petition signed by some of the defendant's neighbors complaining about parties at her house and the loud and occasionally gross behavior by some of the guests, Respondent repeatedly permitted neighbors who were present to interrupt and further challenge the 23-year-old unrepresented defendant. Respondent failed to maintain appropriate decorum, engaged in similar conduct by echoing some of the neighbors' comments and complaints regarding alleged incidents not part of the noise violation charge to which the defendant had pled guilty, contributing to the appearance that Respondent was motivated by personal ire and to seek public approbation in sentencing Ms. Granata as she did.

28.     On November 28, 2006, Respondent granted Ms. Granata's *Ex-Parte* Emergency Motion for Work Release. On December 4, 2006, Respondent denied Ms. Granata's motion to set aside the plea.

The standards set forth in *Brown* are also being applied to the following conclusions of the Judicial Tenure Commission, which we adopt as our own:

Respondent's conduct, as drawn from the stipulated and found facts, constitutes:

a.     Misconduct in office as defined by the Michigan Constitution of 1963, as amended, Article VI, § 30 and MCR 9.205;

b.     Conduct clearly prejudicial to the administration of justice, as defined by the Michigan Constitution of 1963, as amended, Article VI, § 30, and MCR 9.205;

c.     Failure to establish, maintain, enforce and personally observe high standards of conduct so that the integrity and independence of the judiciary may be preserved, contrary to the Michigan Code of Judicial Conduct ("MCJC"), Canon 1;

d.     Failure to bear in mind that the judicial system is for the benefit of the litigant and the public, not the judiciary, contrary to MCJC, Canon 1;

e.     Conduct involving impropriety and the appearance of impropriety, thereby eroding public confidence in the judiciary, in violation of MCJC, Canon 2A;

f.     Failure to respect and observe the law and to conduct oneself at all times in a manner which would enhance the public's confidence in the integrity and impartiality of the judiciary, contrary to MCJC, Canon 2B;

g. Allowing family, social, or other relationships to influence judicial conduct or judgment, in violation of MCJC, Canon 2C;

h. Failure to be patient, dignified, and courteous to those being dealt with in an official capacity, contrary to MCJC, Canon 3A(3);

i. Failure to adopt the usual and accepted methods of doing justice; failure to avoid the imposition of humiliating acts or discipline, not authorized by law in sentencing; and failure to endeavor to conform to a reasonable standard of punishment, contrary to MCJC, Canon 3A(9);

j. Demonstrating a severe attitude toward witnesses, tending to prevent the proper presentation of the cause or ascertainment of the truth, and failure to avoid a controversial manner or tone in addressing litigants or witnesses, in violation of MCJC, Canon 3A(8);

k. Setting grossly excessive bail amounts and failing to appropriately and reasonably consider the provisions of MCR 6.106 regarding bond;

l. Setting harsh and excessive bail, and inflicting unusual punishment, contrary to Michigan Const. 1963, Art. I, § 16.

m. Setting harsh and excessive bail and inflicting unusual sentence, in violation of U.S. Const. Am. VIII: "Excessive bail shall not be required, nor excessive fines imposed, no cruel and unusual punishments inflicted."

n. Persistent failure to treat persons fairly and courteously, contrary to MCR 9.205(B)(1)(c);

o. Conduct prejudicial to the administration of justice, in violation of MCR 9.104(1);

p. Conduct that exposes the legal profession or courts to obloquy, contempt, censure or reproach, contrary to MCR 9.104(2);

q. Conduct contrary to justice, in violation of MCR 9.104(A)(3); and

r. Conduct that violates the standards or rules of professional responsibility adopted by the Michigan Supreme Court, contrary to MCR 9.104(4).

After reviewing the Recommendation of the Judicial Tenure Commission, the respondent's consent, the standards set forth in *Brown*, and the above findings and conclusions, we order that the Honorable Norene S. Redmond be publicly censured. This order stands as our public censure.

WEAVER, J., concurs and states as follows:

I concur in the order of this Court agreeing with the recommendation of the Judicial Tenure Commission that the respondent, the Honorable Norene S. Redmond, be publicly censured on the basis of the findings of fact to which the respondent stipulated.

I write separately to note that the commission's recommendation includes findings based on facts to which the respondent did not stipulate. Specifically, paragraph 3 of the settlement agreement states:

> 3. The parties stipulate that a set of stipulated facts ("Stipulated Facts") shall be presented to the Commission, which shall be the sole factual basis for the Commission's decision and recommendation in this matter.

Because the commission exceeded the scope of the agreement to which the respondent stipulated by basing its recommendation on additional facts not included in the original stipulation, the respondent would likely be relieved from her corresponding promise to accept public censure. However, because the respondent has not challenged the inclusion of additional facts beyond the facts to which she stipulated, I concur in the order of public censure.

CORRIGAN, J., joins the statement of WEAVER, J.



I, Corbin R. Davis, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

February 6, 2008

_Corbin R. Davis_
Clerk

t0130