**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:
Clifford W. Taylor

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman

FILED JULY 31, 2006

In re Honorable MICHAEL J. HALEY
Judge, 86th District Court.

No. 127453

_____

BEFORE THE ENTIRE BENCH

YOUNG, J.

The Judicial Tenure Commission (JTC) has recommended that this Court publicly censure respondent 86th District Court Judge Michael Haley for accepting in open court football tickets from an attorney appearing before him. Canon 5(C)(4) of the Michigan Code of Judicial Conduct prohibits a judge or family member residing in the judge's household from accepting "a gift, bequest, favor, or loan from anyone . . . ." This general prohibition is subject to three exceptions. Consistent with the JTC recommendation, we conclude that respondent violated Canon 5(C)(4), and that the gift at issue did not fit within any of the listed exceptions. In particular, respondent's acceptance of the football tickets was not an instance of "ordinary social hospitality," an exception found in Canon 5(C)(4)(b). Having decided that respondent was in violation of a specific, controlling judicial canon, we conclude that it is inappropriate to also consider

whether respondent created a general appearance of impropriety under Canon 2, as urged by the examiner.

The JTC concluded, after applying the *Brown* factors,[1] that respondent's misconduct significantly harmed the public's perception of the judiciary and that this ethical lapse warranted a public censure. We agree. Accordingly, we adopt the recommendation of the JTC that respondent be publicly censured.

## I. Facts and Procedural History

Respondent Judge Michael Haley is a member of the 86th District Court in Traverse City, Michigan. On October 14, 2003, he presided over a plea proceeding in a criminal case involving a defendant who allegedly lost control of her vehicle and destroyed a florist's sign. The prosecutor reached a plea agreement with the defendant whereby she would plead guilty of using a vehicle with improper license plates and pay restitution. The defendant and the prosecutor disagreed about the appropriate amount of restitution.

Respondent accepted the guilty plea and stated that the court would sentence the defendant at a future date. The defendant's attorney, Richard Benedict, a retired district judge who had resumed private practice, then approached the bench. Benedict placed two University of Michigan football tickets on the bench, at which time Benedict and respondent engaged in the following colloquy:

---

[1] *In re Brown*, 461 Mich 1291, 1292-1293 (2000).

*Mr Benedict*:  You got to promise to go.

*The Court*:  It's a week from Saturday?

*Mr Benedict*:  No, Saturday.

*The Court*:  This Saturday.  Hmm, I could go.

*Mr Benedict*:  Promise.

*The Court*:  I promise to go?  I've got to make a phone call. Today's Tuesday, where are you tomorrow?

*Mr Benedict*:  The office.  No, I'm in Kalkaska.  If you want it, take it.

*The Court*:  Okay.  If there's anybody else that—

*Mr Benedict*:  When you said you were interested, I indicated that I still have to ask another.  If you can't go, somebody's got to go.

*The Court*:  I'll make sure somebody goes and that you get paid.

*Mr Benedict*:  I don't need to get paid.

*The Court*:  Okay.  All right.

*Mr Benedict*:  I need to make sure there's [sic] two people sitting in the seats.

Respondent accepted the tickets.  He then reconsidered his earlier decision to postpone sentencing, and sentenced the defendant to a $100 fine, $250 in court costs, a $40 state fee, an undetermined amount of restitution, and six months of probation.  He later determined restitution to be $4,116.35, which was the full amount sought by the victim and the prosecutor.

3

Officer Terry Skurnit was the court officer present in the courtroom at the time of the plea proceeding, and he watched respondent accept the tickets. Officer Skurnit told a supervisor about the incident, who informed the prosecutor, who in turn told respondent about Skurnit's complaint. On October 31, 2003, respondent wrote a letter to Skurnit's superior, Sheriff Terry Johnson, notifying Johnson that respondent had banned Skurnit from respondent's courtroom. Skurnit then filed a request for investigation with the JTC.

After conducting a preliminary investigation, on November 18, 2004, the JTC filed a two-count complaint against respondent. Count one alleged that respondent engaged in impropriety or created an appearance of impropriety by accepting the football tickets. Count two alleged that respondent misrepresented facts to the JTC and demonstrated a lack of candor in the course of the investigation. On January 5, 2005, this Court appointed as master the Honorable Casper O. Grathwohl to preside over the hearing.

After hearing the matter, the master submitted a written report recommending no discipline on either count. The master conceded that respondent's acceptance of the football tickets was "inappropriate" and "displayed poor judgment." However, he concluded that the examiner had not proven by a preponderance of the evidence that respondent engaged in misconduct. The examiner filed an objection to the master's report, challenging the master's

4

conclusions of law regarding count one.[2] The JTC scheduled a public hearing for July 11, 2005.

Following the public hearing, the JTC issued a written opinion rejecting the master's conclusions of law[3] and recommending that this Court publicly censure respondent.[4] It concluded that respondent's acceptance of the football tickets constituted:

> (1) Misconduct in office, as defined by the Michigan Constitution of 1963, as amended, Article 6, Section 30 and MCR 9.205;

> (2) Conduct clearly prejudicial to the administration of justice, as defined by the Michigan Constitution of 1963, as amended, Article 6, Section 30, and MCR 9.205;

> (3) Failure to establish, maintain, enforce, and personally observe high standards of conduct so that the integrity and independence of the judiciary may be preserved, contrary to the Code of Judicial Conduct, Canon 1;

> (4) Irresponsible or improper conduct that erodes public confidence in the judiciary, in violation of the Code of Judicial Conduct, Canon 2A;

> (5) Conduct involving impropriety and the appearance of impropriety, in violation of the Code of Judicial Conduct, 2A;

---

[2] The examiner did not challenge the master's conclusion regarding count two, and dismissed that count. Accordingly, count two is no longer at issue in this case.

[3] The JTC criticized the master's legal conclusions for lacking any explanation or legal support.

[4] Two members of the nine-member JTC panel dissented in part from the recommendation. Although they concurred with the public censure, they also urged this Court to suspend respondent without pay for 30 days.

(6)  Failure to conduct oneself at all times in a manner that would enhance the public's confidence in the integrity and impartiality of the judiciary, contrary to the Code of Judicial Conduct, Canon 2B;

(7)  Improper acceptance of a gift from a donor whose interests have come or are likely to come before you, contrary to Canon 5C(4)(c);

(8)  Conduct that exposes the legal profession or the courts to obloquy, contempt, censure, or reproach, in violation of MCR 9.104(A)(2); and

(9)  Conduct that is contrary to justice, ethics, honesty or good morals, in violation of MCR 9.104(A)(3).

The JTC rejected respondent's contention that he had not engaged in misconduct because his actions fell within two of the three exceptions to the general prohibition of accepting gifts in Canon 5(C)(4). The JTC analyzed both exceptions and concluded that the tickets did not constitute "ordinary social hospitality" and that the gift was not offered by a disinterested party.

Having found that respondent engaged in misconduct, the JTC considered the appropriate sanction under the *Brown* factors.[5]  It considered five factors

---

[5] *In re Brown*, *supra* at 1292-1293.  In *Brown* this Court articulated standards for judicial discipline so that the JTC could "undertake a reasonable effort . . . to ensure a consistent rule of law" when dispensing discipline, thereby protecting the judge's due process rights. *Id*. at 1295.  Thus, the *Brown* decision sought to ensure that disciplinary sanctions were both proportionate to the ethical infraction and reasonably consistent with sanctions given for similar judicial misconduct.

The standards announced in *Brown* are:

(continued…)

relevant to this disciplinary matter. First, the acceptance of the tickets was an isolated instance rather than part of a pattern or practice of misconduct. Second, the misconduct took place on the bench rather than off the bench. Third, the misconduct was not prejudicial to the *actual* administration of justice, because respondent ordered the exact amount of restitution that had been sought by the prosecutor. Thus, there was no judicial act that appeared to favor Benedict's

_____
(…continued)

> (1) misconduct that is part of a pattern or practice is more serious than an isolated instance of misconduct;
>
> (2) misconduct on the bench is usually more serious than the same misconduct off the bench;
>
> (3) misconduct that is prejudicial to the actual administration of justice is more serious than misconduct that is prejudicial only to the appearance of impropriety;
>
> (4) misconduct that does not implicate the actual administration of justice, or its appearance of impropriety, is less serious than misconduct that does;
>
> (5) misconduct that occurs spontaneously is less serious than misconduct that is premeditated or deliberated;
>
> (6) misconduct that undermines the ability of the justice system to discover the truth of what occurred in a legal controversy, or to reach the most just result in such a case, is more serious than misconduct that merely delays such discovery;
>
> (7) misconduct that involves the unequal application of justice on the basis of such considerations as race, color, ethnic background, gender, or religion are more serious than breaches of justice that do not disparage the integrity of the system on the basis of a class of citizenship. [*Id.* at 1292-1293.]

client. Fourth, the acceptance of the football tickets, by itself, created an appearance of impropriety. Fifth, the misconduct was not spontaneous, because respondent and Benedict had discussed the gift in the prior week. Because the misconduct took place while respondent was on the bench, it created an appearance of impropriety and was not spontaneous, the JTC believed that the conduct in question warranted some form of a sanction.

In addition to balancing the relevant *Brown* factors, in its effort to determine a proportionate sanction, the JTC considered similar disciplinary actions both from this state and from other jurisdictions. It found that disciplinary actions in Michigan provided "little guidance" because of their factual dissimilarity.[6] Therefore, it turned to similar cases from other jurisdictions where the judge improperly accepted sports tickets and received a public reprimand.[7] In light of these considerations, the JTC recommended that this Court publicly censure respondent in order to restore public confidence in the integrity of the judiciary.

---

[6] See e.g., *In re Lawrence*, 417 Mich 248; 335 NW2d 456 (1983) (the respondent censured, suspended, and ordered to return funds for, among other things, accepting free representation from an attorney in exchange for assigning that attorney indigent criminal cases and improperly retaining campaign funds); *In re Jenkins*, 437 Mich 15; 465 NW2d 317 (1991) (the respondent was removed from office for accepting gifts from litigants appearing before him, soliciting and accepting bribes, communicating ex parte with litigants, soliciting perjury from an individual, and intentionally misrepresenting information on an insurance application).

[7] See *Office of Disciplinary Counsel v Lisotto*, 94 Ohio St 3d 213; 761 NE2d 1037 (2002); *Inquiry Concerning a Judge,* 756 So 2d 76 (Fla, 2000); *In re Daghir*, 657 A2d 1032 (Pa Ct of Judicial Discipline, 1995).

## II. Standard of Review

The Michigan Constitution authorizes this Court to discipline judges upon recommendation by the JTC.[8] This Court reviews the JTC's factual findings and disciplinary recommendations de novo.[9] Findings of misconduct must be supported by a preponderance of the evidence.[10] Although we review the JTC's recommendations de novo, this Court generally will defer to the JTC's recommendations when they are adequately supported.[11]

## III. Analysis

### a. Respondent's actions violated Canon 5(C) of the Code of Judicial Conduct

Respondent challenges the JTC's conclusion that he engaged in misconduct and the JTC's recommendation that he receive a public censure.[12]

Canon 5 of the Michigan Code of Judicial Conduct regulates a judge's extrajudicial activities to "Minimize the Risk of Conflict With Judicial Duties." It specifically addresses a judge's avocational pursuits, civic and charitable

---

[8] Const 1963, art 6, § 30(2).

[9] *In re Noecker*, 472 Mich 1, 8; 691 NW2d 440 (2005).

[10] *Id*.

[11] *In re Brown, supra* at 1293.

[12] Respondent argues, additionally, that the JTC violates respondent's due process rights by mixing prosecutorial and judicial functions. We have considered and rejected this argument and regard the question as settled. We decline to address this claim. See *In re Chrzanowski*, 465 Mich 468, 485; 636 NW2d 758 (2001).

9

involvement, financial activities, fiduciary responsibilities, arbitration, practice of law, and extrajudicial appointments. Of interest to this case is Canon 5(C), which lists financial activities from which a judge should either abstain or carefully limit his participation. For purposes of this case, we turn our attention to Canon 5(C)(4), which declares that "[n]either a judge nor a family member residing in the judge's household should accept a gift, bequest, favor or loan from anyone . . . ."

Notwithstanding its clear prohibition against accepting gifts, Canon 5(C)(4) permits a judge to do so in carefully defined situations set forth in three provisions of the canons. A judge may accept

> a gift or gifts not to exceed a total value of $100, incident to a public testimonial; books supplied by publishers on a complimentary basis for official use; or an invitation to the judge and spouse to attend a bar-related function or activity devoted to the improvement of the law, the legal system, or the administration of justice.[13]

A judge or a family member residing in the judge's household may also accept

> *ordinary social hospitality*; a gift, bequest, favor, or loan from a relative; a wedding or engagement gift; a loan from a lending institution in its regular course of business on the same terms generally available to persons who are not judges; or a scholarship or fellowship awarded on the same terms applied to other applicants.[14]

Finally, a judge or a member of the judge's household may accept

> any other gift, bequest, favor, or loan *only if the donor is not a party or other person whose interests have come or are likely to come*

---

[13] Code of Judicial Conduct, Canon 5(C)(4)(a).

[14] Code of Judicial Conduct, Canon 5(C)(4)(b) (emphasis added).

*before the judge*, and, if its value exceeds $100, the judge reports it in the same manner as compensation is reported in Canon 6C.[15]

We agree with the JTC that respondent violated Canon 5(C) by accepting football tickets from Benedict in open court. Two of the aforementioned provisions clearly do not apply in this case. The first, Canon 5(C)(4)(a), permits specific types of gifts valued under $100, such as gifts associated with public testimonials, complimentary books provided by publishers for official use, or bar-related functions and activities devoted to the improvement of the law, the legal system, or the administration of justice. The football tickets do not fit into any of these narrow categories, so this first exception is inapposite. Second, Canon 5(C)(4)(c) permits gifts from a donor that "is not a party or other person whose interests have come or are likely to come before the judge . . . ." The record established that Benedict routinely appeared before respondent representing his clients and was actually appearing before respondent when he offered the gift. Canon 5(C)(4)(c) also does not fit the present case.

The remaining provision, Canon 5(C)(4)(b), permits the judge to accept "ordinary social hospitality." The focus of our analysis, then, is whether respondent's acceptance of the football tickets was a permissible instance of "ordinary social hospitality."

---

[15] Code of Judicial Conduct, Canon 5(C)(4)(c) (emphasis added).

In deciding this issue, the JTC imported a multi-factor test from Illinois, *In re Corboy*, 124 Ill 2d 29, 42-43; 528 NE2d 694 (1988), to analyze whether respondent received the gift as ordinary social hospitality.[16] The *Corboy* test is an attempt to add objectivity to an inquiry that is otherwise quite fact-intensive. It considers (1) the monetary value of the gift, (2) the relationship, if any, between the judge and the donor, (3) social practices and customs associated with gifts, and (4) the particular circumstances surrounding the gift.

The canons do not define the phrase "ordinary social hospitality." However, one of our guiding principles in matters of judicial discipline is that we must measure respondent's conduct objectively.[17] That is, when determining whether the acceptance of a particular gift is consistent with "ordinary social hospitality" we view the conduct through an objective lens. Whether the donor or the judge *intended* the gift to be ordinary social hospitality is irrelevant. Rather, we must inquire how the reasonable observer would view the gift.

---

[16] In addition to referencing the Illinois test, the JTC briefly mentioned California's definition of "social hospitality" as a gift that no reasonable person would believe that (1) the donor intended to or would receive any advantage, or (2) the donee would believe that the donor intended to obtain any advantage. *Adams v Comm on Judicial Performance*, 10 Cal 4th 866, 880; 897 P2d 544 (1995). Because we resolve this case without relying on either Illinois or California's respective definitions of "ordinary social hospitality," we take no position on the propriety of these definitions to the extent they do not conflict with our reasoning in this opinion.

[17] In matters of judicial discipline, we have repeatedly used an objective approach. See *In re Ferrara*, 458 Mich 350, 362; 582 NW2d 817 (1998).

We note that the *Corboy* test straightforwardly states some commonsense principles that help to assess whether the acceptance of a gift is an instance of "ordinary social hospitality." A reasonable observer would likely look to the value of the gift, the type of relationship between the donor and the recipient, the social practices associated with gifts of like kind, and the particular circumstances surrounding the particular gift-giving instance. To that extent, the *Corboy* test is not offensive to the plain meaning of the phrase "ordinary social hospitality."

However, we need not engage in the intricate balancing of the *Corboy* factors to resolve this case. Given our objective focus, we can conclude, simply from the plain meaning of the phrase "ordinary *social* hospitality," that social hospitality requires a *social* context. Here, the context of respondent's acceptance of the football tickets was not social, but rather a *judicial,* context. The singularizing fact of this case is that *respondent accepted a gift in open court in the course of executing his judicial duties*. That the gift of tickets might well be deemed "ordinary" in other contexts does not make its acceptance in a nonsocial setting consonant with the canon. It would not have mattered, for example, that Benedict and respondent had a longstanding tradition of giving and receiving football tickets. The fact that the gift was offered in open court by a litigant in a pending case excludes the possibility that the event can objectively be characterized as "*social* hospitality." We do not believe that a reasonable observer would conclude that "ordinary social hospitality" fairly describes an exchange of gifts in open court between a litigant in an immediately pending case and a judge

13

in that same case.[18]   We believe these facts are dispositive of this case and that

they are not balanced or alleviated by any other factors.[19]

In addition to violating the explicit prohibition of Canon 5(C) against

receiving gifts, the examiner also urges this Court to find that respondent created

an "appearance of impropriety" in violation of Canon 2.[20]  We decline to create an

independent "appearance of impropriety" standard to judge respondent's behavior

when there is an express, controlling judicial canon.  A majority of this Court has

recently agreed that

> [t]he "appearance of impropriety" standard is relevant not where
> there are specific court rules or canons that pertain to a subject . . .
> but where there are *no* specific court rules or canons that pertain to a
> subject and that delineate what is permitted and prohibited judicial
> conduct.  Otherwise, such specific rules and canons would be of

---

[18] We disagree with the assertion by the concurring justices that whether a gift is social hospitality does not depend on where the gift was made.  Clearly, the context in which the gift is given and accepted bears significantly on whether the gift is "ordinary" and "social."  To conclude that respondent did not violate Canon 5(C), a canon that specifically addresses the prohibition against gifts, but did violate Canon 2, would put the Code of Judicial Conduct at odds with itself.  As we discuss later in this opinion, this conclusion is untenable.

[19] We do not mean to disapprove of all gifts given to a judge by practicing attorneys or of all gifts accepted by the judge in his or her official capacity.  For example, the gift here was not merely a symbolic gift that might be provided to a judge, for example, during a ceremonial occasion such as an investiture.  See Canon 5(C)(4)(a). We do not and cannot, in this decision, delineate between "ordinary social hospitality" and improper acceptance of a gift in every circumstance.  However, as a basic proposition, members of the judiciary may not accept personal gifts in open court and believe that they merely are accepting "ordinary social hospitality."

[20] Code of Judicial Conduct, Canon 2(A) ("A judge must avoid all impropriety and appearance of impropriety.").

little consequence if they could always be countermanded by the vagaries of an "appearance of impropriety" standard.[21]

We reaffirm and apply that reasoning in this case. The more general "appearance of impropriety" standard does not govern when the specific prohibition in Canon 5(C) controls. Otherwise, the "appearance of impropriety" standard would undermine, and potentially countermand, the remaining canons' authority to proscribe and prescribe specific judicial conduct. We reserve application of the "appearance of impropriety" standard to conduct by a judge that is neither permitted nor forbidden by a specific canon. We decline to allow general allegations of impropriety that might overlap specifically authorized or prohibited behavior and conduct to supersede canons that specifically apply to the conduct in question. Accordingly, we find respondent engaged in misconduct by accepting a gift in contravention of Canon 5(C) and is thus subject to sanctions under the Michigan Constitution[22] and our court rules that implement the Constitution.[23]

b. The JTC's Recommendation of Public Censure is Proportional

The JTC recommended that respondent be publicly censured. Respondent contends that public censure is disproportionate because he did not engage in intentional conduct, intentional retaliation, crimes of violence, or physical

_____

[21] *Adair v Michigan*, 474 Mich 1027, 1039 (statement of Taylor, C.J., and Markman, J.), 1051 (statement of Corrigan, J.), 1053 (statement of Young, J.) (2006).

[22] Const 1963, art 6, § 30.

[23] MCR 9.205(B)(2).

15

misconduct. Respondent asserts that this Court has imposed public censure only in such instances. We disagree with respondent's position.

When determining the appropriate sanction, this Court seeks not to punish the judge, but to maintain the integrity of the judicial process and protect the citizenry from corruption and abuse.[24] With that goal in mind, we agree with the JTC that public censure is a proportionate measure of discipline. Our consideration of the pertinent *Brown* factors confirms our decision. The most applicable *Brown* factor cautions that misconduct on the bench is usually more serious than the same misconduct off the bench. By accepting football tickets while on the bench, respondent failed to uphold a specific canon in the Code of Judicial Conduct. He jeopardized public confidence in the integrity and impartiality of the judiciary. While respondent was clearly not accepting a bribe, his actions were an inappropriate lapse of ethical judgment, and his casual acceptance of the football tickets reflected poorly on the court—an institution that the people of this state must be able to hold in the highest regard.[25] Respondent exposed the court to unfavorable public scrutiny. Indeed, this is the type of errant behavior that the drafters of Canon 5(C) specifically intended to avoid by generally prohibiting judges from accepting gifts. For the sake of protecting the

---

[24] *In re Ferrara*, supra at 372.

[25] We agree with Justice Cavanagh that respondent has an "exemplary record and a long history of distinguished service." *Post* at 2.

16

public's confidence in the impartiality of the judiciary, we believe that public censure is an appropriate sanction in this matter and reinforces a basic standard of acceptable conduct for members of the judiciary.

IV.  Response to Justices Kelly and Cavanagh

Justices Kelly and Cavanagh conclude that respondent's acceptance of the football tickets was, in fact, an instance of "ordinary social hospitality" within the meaning of Canon 5(C)(4)(b), but that it created an appearance of impropriety under Canon 2.  In other words, although they believe that respondent's conduct is specifically *permitted* under Canon 5(C)(4)(b), they conclude that respondent nevertheless should be sanctioned.  However,  if we agreed with Justices Kelly and Cavanagh that respondent's acceptance of the football tickets in open court was nothing more than an instance of "ordinary social hospitality" (which, of course, we do not) and, thus, specifically permitted under Canon 5(C)(4)(b), we would be compelled to hold that respondent should not be sanctioned.  Conduct that is permitted by the canons simply cannot create an "appearance of impropriety."  As observed by Chief Justice Taylor and Justice Markman in *Adair*, it would be an ethical "snare" for judges if they could be sanctioned for actions that are permitted under the canons.  We simply cannot tell judges that they are allowed to accept "ordinary social hospitality" and then sanction them for accepting the same.  As with all other citizens, judges are entitled to be governed by the rule of law rather than by standardless and amorphous decision-making, in which even compliance with written law is insufficient to ensure that a judge will

17

not be found to be in violation of such law. If Justices Kelly and Cavanagh believe that Canon 5 is inadequate, they are free to seek its modification; however, they are not free to invoke an "appearance of impropriety" for conduct that they believe is permitted under Canon 5, but of which they personally disapprove.

Further, our determination to rely on specific judicial canons where applicable, rather than a general and less determinate "appearance of impropriety" standard, employs a principle of construction similar to that used in *Cain v Dep't of Corrections*[26] and is consistent with established principles of statutory interpretation.

In *Cain*, this Court held that a trial judge could not be disqualified under MCR 2.003(B)(1) where there was no showing of "actual bias." This Court looked *primarily* to that court rule, which specifically governs disqualification matters, and only when it found there was no violation of the disqualification rules did it *then* turn to the more amorphous due process disqualification test found in *Crampton v Dep't of State*.[27]

Also, it is a settled rule of statutory construction that where a statute contains a specific statutory provision and a related, but more general, provision, the specific one controls.[28] We have used principles of statutory construction to

---

[26] 451 Mich 470; 548 NW2d 210 (1996).

[27] 395 Mich 347; 235 NW2d 352 (1975).

[28] *Gebhardt v O'Rourke*, 444 Mich 535, 542-543; 510 NW2d 900 (1994).

construe our court rules,[29] and we see no reason not to apply principles of statutory construction to the Code of Judicial Conduct to give effect to its terms.[30] Therefore, since respondent violated the specific provision in Canon 5(C), there is simply no reason to apply the more general "appearance of impropriety" standard in this case.

Although our concurring colleagues' unfounded hand-wringing suggests otherwise, we are not diminishing, trivializing, or undermining the potency of the "appearance of impropriety" standard by assigning it its proper role within the

---

[29] See, e.g., *In re KH*, 469 Mich 621, 628; 677 NW2d 800 (2004).

[30] Although Justice Kelly accuses the majority of upsetting past practice with this decision, it is Justices Kelly and Cavanagh who seek to interject a remarkable principle of textual interpretation that exposes a judge to ethical violations where the judge has *complied* with a specific provision in the canons. Indeed, in not one of the cases of judicial discipline cited by Justice Kelly, *post* at 14 , did this Court find the judge in violation of Canon 2 but not in violation of a more specific court rule or canon.

We are unable to understand why Justice Kelly takes us to task for failing to "double count" for any purpose in this case a presumed violation of the "appearance of impropriety" standard in Canon 2. Justice Kelly fails to appreciate why, when there is an *actual impropriety* created by a violation of a *specific* canon, there can be no mere *appearance* of impropriety for the same conduct. An appearance of impropriety violation is subsumed by a *frank violation* of another canon. When there is a violation, there is no mere appearance of one. This is a concept that obviously eludes our colleagues.

Justice Kelly's discussion of *In re Ellender*, 889 So 2d 225 (La, 2004), misapprehends today's holding that, if a judge's action was controlled and either permitted or proscribed by a specific judicial canon, we would not separately analyze whether that act created an appearance of impropriety. It is unclear why the Louisiana decision cited by Justice Kelly is a critique of our construction of the canons.

Code of Judicial Conduct. We are not giving license to members of Michigan's judiciary to exercise their duties unethically. Indeed, where no canon applies that specifically allows or prohibits particular judicial conduct, the "appearance of impropriety" standard *is* appropriate and we certainly would undertake that analysis. But as we have clearly shown, such is not the case here, where respondent failed to observe the prohibition in Canon 5(C) against accepting gifts.

Justice Cavanagh criticizes the majority because our decision today is consistent with *Adair*, in which two members of the majority responded to motions for disqualification and explained their views in this regard. Had the two justices not responded to those motions, doubtless Justice Cavanagh would have been the first to declaim their failure to do so. Now, with the two justices having explained at length their perspectives on the relationship between the "appearance of impropriety" and specific Michigan court rules, it is apparently Justice Cavanagh's view that the Court should not apply these same perspectives to the conduct of other judges even though a majority of justices agree with their construction.

Just as we differ with Justice Cavanagh in our conclusion that the rule of law requires that judges, like all other citizens, should be permitted to rely on the written law in conforming their conduct without those written laws being trumped by the general and less determinate "appearance of impropriety" standard, we also differ with Justice Cavanagh in our conclusion that the rule of law requires the *consistent* application of controlling legal principles. We apply the *Adair* standard

20

to Judge Haley because we conclude that it is the correct standard and, as such, it must be applied consistently to similarly situated members of the judiciary.

We believe that the "public's trust" in the judicial ethics process is far more likely to be enhanced where there is a consistent rule of law, rather than where matters are left to our concurring colleagues' evolving sense of conscience.

V. Response to Justice Weaver

Rather than engage the members of this Court on the legal issues relevant to this case, Justice Weaver has abandoned any pretense of persuasion or an appeal to reason and delivered herself of an unwarranted and intentionally vile personal diatribe whose sole purpose is to denounce and injure her colleagues in the majority. Her opinion here is a prologue to the more venomous allegations Justice Weaver makes in *Grievance Administrator v Fieger*.[31] As we have responded to such allegations in *Grievance Administrator v Fieger*, we decline to dignify Justice Weaver's splenetic opinion here by responding further to it.

VI. Conclusion

For the reasons stated above, we adopt the JTC's conclusion that respondent violated Canon 5(C) of the Code of Judicial Conduct and its recommendation that public censure is appropriate discipline. We consider the question whether respondent created an appearance of impropriety by his actions on the bench to be unnecessary where a specific canon addresses his conduct and

---

[31] 476 Mich __; __ NW2d __ (Docket No. 127547, decided July 31, 2006).

21

such canon has been violated.  We hereby order respondent to be publicly censured, with an order to that effect to be issued immediately.

Robert P. Young, Jr.<br>
Clifford W. Taylor<br>
Maura D. Corrigan<br>
Stephen J. Markman

STATE OF MICHIGAN

SUPREME COURT

In re Honorable MICHAEL J. HALEY                    No. 127453
Judge, 86th District Court.

_____

CAVANAGH, J. (*concurring*).

I concur in the result reached by Justice Kelly in her concurring opinion, namely, that the tickets qualify as ordinary social hospitality but that Judge Haley's acceptance of the tickets in open court gave rise to an appearance of impropriety.[1]  Further, even though Judge Haley exercised poor judgment on this

_____

[1] The majority's avoidance of the appearance of impropriety standard and Canon 2 can easily be explained.  The majority uses this case as a vehicle to effectuate its own  view on how Canon 2 is to be interpreted.  It is readily apparent from today's decision that the majority does not fully embrace the appearance of impropriety standard.  Indeed, it is becoming increasingly clear that the majority does not believe that the appearance of impropriety standard deserves any meaningful consideration because the majority will simply discover and rely on a more "specific" court rule or canon in a given case, as is evident from this case and the individual disqualification statements filed in *Adair v Michigan*, 474 Mich 1027 (2006).  Having been the target of multiple motions for disqualification, it is understandable that the current majority prefers this approach and characterizes such accusations as "vague, subjective, and increasingly politically directed." *Adair*, *supra* at 1039 (statement by Taylor, C.J., and Markman, J.).  Without question, the majority is entitled to its own view.

But I am disappointed that the majority uses this case to transform its own view on the appearance of impropriety standard into new law.  Simply stated, this case is not the proper vehicle by which to make this change, and the majority's analysis will virtually eliminate Canon 2.  This Court is currently engaged in a discussion about the proper procedure for judicial disqualifications, as well as the ethical standards implicated in such a procedure.  Further,  this Court  will  soon

(continued…)

occasion, he has an exemplary record and a long history of distinguished service.

Accordingly, I would have preferred the Judicial Tenure Commission to have resolved this matter without the issuance of a complaint. But under these particular circumstances, and in light of Const 1963, art 6, § 30 and MCR 9.205, public censure appears to be an appropriate discipline.

Michael F. Cavanagh

_____

(…continued)

be asking for public comment and input to further this discussion in a more open manner. Accordingly, the majority's timing in this case could not be worse. If the majority has already made up its mind on the weight afforded to the appearance of impropriety standard, then I fear today's decision has the potential to undermine this entire process and the public's trust. To many, soliciting public comment on a matter on which the majority has issued an opinion just months before will be seen as merely an exercise in futility.

Moreover, I find it troubling that the majority elected to use the disqualification statement circulated by Chief Justice Taylor and Justice Markman in *Adair* to set forth new law in this case. Given that the statement was itself made in response to allegations of appearance of impropriety against the authors, the election to issue that statement was highly unusual, and because the statement was not binding on this Court, I question the rationale behind relying on that statement to effectuate change in this particular case. Rather, I would have preferred the current majority to address its preference on how Canon 2 should be interpreted in a more transparent manner and in a more appropriate and public forum; namely, the upcoming public hearing that has been scheduled for this precise purpose.

2

STATE OF MICHIGAN

SUPREME COURT

In re Honorable MICHAEL J. HALEY,                    No. 127453
Judge, 86th District Court.

_____

WEAVER, J. (*concurring*).

I concur in the majority's decision to adopt the Judicial Tenure Commission's (JTC's) recommendation of a public censure for Judge Haley's acceptance of University of Michigan football tickets from a defense attorney while on the bench, in open court, during sentencing, but I strongly disagree with the majority's reasoning.

Every judicial discipline case is important, but the significance of this case goes beyond disciplining an individual judge. This case has been used by the majority (Chief Justice Taylor and Justices Corrigan, Young, and Markman) as a vehicle to rewrite how the rules of conduct that govern judges will be applied by questioning and rejecting the application of the appearance of impropriety standard in Canon 2 of the Code of Judicial Conduct.

The majority (Chief Justice Taylor and Justices Corrigan, Young, and Markman) attempts to distract from the substance of the legal issues by persistent mischaracterization of my concurrence and motives.

The two nonlawyer citizens on the nine-member JTC first raised the point that Judge Haley's actions gave the appearance of accepting a bribe:

On its appearance the most severe conclusion that can be drawn is a bribe was offered and accepted by a judge during a trial.

Let me make it clear that I do not contend that Judge Haley *actually* accepted or was even offered a bribe. But to an objective, informed observer, it would *appear* that Judge Haley was offered and accepted a bribe for favorable treatment.

Further, I do not stand alone in disagreeing with the majority's rejection of the appearance of impropriety standard set out in Canon 2(A) of the Code of Judicial Conduct. Justices Cavanagh, Kelly, and I agree that the majority errs in rejecting consideration of and trivializing the *appearance* of impropriety created by Judge Haley's conduct under Canon 2(A) of the Code of Judicial Conduct.

It is true, as the majority concludes, that Judge Haley violated Canon 5(C)(4)(c) of the Code of Judicial Conduct by accepting a gift during a hearing from an attorney representing a criminal defendant. But that is not the only judicial duty that the JTC found that Judge Haley's acceptance of the University of Michigan football tickets while on the bench violated.

The JTC based its recommended discipline on its conclusion that Judge Haley's acceptance of the tickets violated a total of nine judicial duties articulated by the Michigan Constitution, the Michigan Court Rules, and the Michigan Code of Judicial Conduct. Unprecedented and incorrect is the majority's holding that consideration of only the one most specific violation of judicial duty is appropriate in determining the discipline to be imposed.

2

The timing of the majority's new approach to JTC cases, and its vigorous rejection of the appearance of impropriety standard of Canon 2(A), is noteworthy. Canon 2(A) states in pertinent part:

> Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges. *A judge must avoid all impropriety and appearance of impropriety.* [Emphasis added.]

Members of the majority have recently been accused of their own appearances of impropriety for their participation in various cases. They have attempted to characterize these accusations as politically and philosophically motivated, but it is alarming that now the majority's apparent solution to their predicament is to rewrite how the rules that govern the conduct of judges will be applied.[1]

---

[1] There have been a number of motions for disqualification against the justices in the majority based on the justices' actions. For example:

● On February 20, 2006, the Committee to Re-elect Justice Maura Corrigan sent out a fund-raising letter from former Governor John Engler stating that "[w]e cannot lower our guard should the Fiegers of the trial bar raise and spend large amounts of money in hopes of altering the election by an 11th hour sneak attack." This statement was one of the grounds listed in the motion for disqualification filed against Justice Corrigan by the respondent, Geoffrey Fieger, in *Grievance Administrator v Fieger,* 475 Mich 1211 (2006).

● In a speech at the Republican Party state convention in August 26, 2000, Justice Young said that "Geoffrey Fieger, and his trial lawyer cohorts hate this court. There's honor in that." This statement was one of the grounds listed in the motion for disqualification filed against Justice Young by the plaintiff's attorney, Geoffrey Fieger, in *Gilbert v DaimlerChrysler Corp,* 469 Mich 883 (2003).

● A campaign ad paid for by "Robert Young for Justice," "Stephen Markman for Justice," and "Clifford Taylor for Justice" included the language "No wonder Geoffrey Fieger, Jesse Jackson and the trial lawyers support Robinson, Fitzgerald and Thomas" (who ran against Chief Justice Taylor and Justices Young and Markman in the 2000 Supreme Court election). This statement was one of the grounds listed in the motion for disqualification filed

(continued…)

3

The majority (Chief Justice Taylor and Justices Corrigan, Young, and Markman) seriously errs in rejecting consideration of and trivializing the appearance of impropriety created by Judge Haley's conduct under Canon 2(A) of the Code of Judicial Conduct. The majority also errs in its unexplained failure to consider the JTC's findings of seven additional instances of judicial misconduct.

A

While Judge Haley was on the bench, in open court, he accepted a gift of two University of Michigan football tickets, valued at $92, from attorney Richard Benedict, during a criminal hearing in which Mr. Benedict was representing the criminal defendant. Transcripts from the hearing reveal that Judge Haley planned to sentence the defendant, Mr. Benedict's client, at a later date. However, after accepting the gift from the defendant's attorney, Judge Haley immediately imposed a sentence on the defendant, stating to Mr. Benedict, "I'll just sentence her right now and save you the trip back." Saving Mr. Benedict a "trip back" meant that Mr. Benedict would not have to repeat the time-consuming,

_____

(…continued)
against Chief Justice Taylor and Justices Young and Markman by the plaintiff's attorney, Geoffrey Fieger, in *Gilbert.*

● In *Adair v Michigan,* 474 Mich 1027 (2006), there was a motion filed asking for the disqualification of Chief Justice Taylor and Justice Markman. Chief Justice Taylor's wife and Justice Markman's wife are lawyers employed by the state Attorney General's office. Sharing a household and sharing income with a spouse who was given an at-will job by a public official whose office regularly appears before the Court formed the basis for the motion for disqualification filed against Chief Justice Taylor and Justice Markman in *Adair.*

4

approximately two-hour round trip from Traverse City to the court in Bellaire for sentencing at a second hearing.

The Judicial Tenure Commission (JTC) found that this conduct violated two provisions of the Michigan Constitution and a related Michigan court rule, two separate Michigan court rules, and five canons of the Code of Judicial Conduct. In light of these violations of judicial conduct, the JTC recommended to this Court that Judge Haley be publicly censured.

The JTC majority highlighted in its reasons for the recommended sanction that Judge Haley's acceptance of the tickets created an appearance of impropriety, noting that the appearance of impropriety "goes right to the heart of a fair, impartial, and unbiased judiciary."

The two nonlawyer, citizen members of the JTC recommended not only a public censure, but also a 30-day suspension without pay. They emphasized the appearance of impropriety created by Judge Haley's acceptance of the tickets, and stated:

> There was no reasonable argument or fact presented convincing us the Respondent [Judge Haley] appreciates the severity of his action. It is abundantly clear to us, though, that a judge taking a gift from a lawyer with a case before him—while sitting on the bench no less—severely harms the judiciary and the appearance of propriety. His actions may well have a negative reflection on judges everywhere. The ultimate result is erosion of the public's respect and confidence in the judiciary and our judicial system.
>
> What is most offending is this whole thing took place on the bench of a courtroom that belongs to the people of the state of Michigan. By popular vote the people bestowed on him the honor of serving them. They put their confidence and *trust* in him to render

5

justice fairly to all who come before him.  His actions violated that trust.

On its appearance the most severe conclusion that can be drawn is a bribe was offered and accepted by a judge during a trial. The least is that the judge's behavior was inappropriate.  Either way it was wrong. [Emphasis in original.]

B

The majority errs in refusing to consider whether Judge Haley's acceptance of football tickets on the bench violated Canon 2(A) of the Code of Judicial Conduct by creating an appearance of impropriety.  The majority concludes that it is "inappropriate" to consider whether Judge Haley created an appearance of impropriety under Canon 2(A).  *Ante* at 1.  In so doing, the majority questions and rejects the application of the appearance of impropriety standard.  Canon 2(A) provides in full:

A Judge Should Avoid Impropriety and the Appearance of Impropriety in All Activities.

A. Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges.  A judge must avoid all impropriety and appearance of impropriety.  A judge must expect to be the subject of constant public scrutiny.  A judge must therefore accept restrictions on conduct that might be viewed as burdensome by the ordinary citizen and should do so freely and willingly.

Despite the Judicial Tenure Commission (JTC)'s finding that Judge Haley's acceptance of the tickets from a defense attorney while on the bench during the sentencing of the defense attorney's client created an appearance of impropriety, the majority explicitly refuses to consider whether the judge's conduct violated

6

Canon 2(A) of the Code of Judicial Conduct by creating an appearance of impropriety.

The majority misleadingly states that it "decline[s] to create an independent 'appearance of impropriety' standard to judge respondent's [Judge Haley's] behavior when there is an express, controlling judicial canon." *Ante* at 14. In purporting to "decline to create" an appearance of impropriety standard, the majority misstates the law governing judicial disciplinary cases. There is no need to *create* an appearance of impropriety standard. That standard already exists as an express, controlling judicial canon—Canon 2(A) of the Code of Judicial Conduct. The JTC found that the violations of Canon 2(A) supported the discipline that it recommended for the judge. By refusing to consider whether there was an appearance of impropriety, the majority effectively dispenses with one of the canons in the Code of Judicial Conduct, Canon 2(A), which states that a judge should avoid the appearance of impropriety in all activities.

For the first time in the context of a JTC case, the majority opines that the Court must rely on the one most specific violation to the exclusion of any additional violations. A violation of one canon has never been deemed to subsume a violation of other canons. Any violation of any canon is its own breach of judicial duty and every separate violation needs to be determined and recognized in the reasons for the discipline imposed. This issue, whether the Court can refuse to consider a violation of the appearance of impropriety standard of Canon 2(A), was not argued or briefed by the parties. Nevertheless, the majority uses this case

to expand upon the foundation laid by Chief Justice Taylor and Justice Markman's statement in *Adair v Michigan,*[2] where the two justices strongly criticized the appearance of impropriety standard and declined to disqualify themselves from participating in the case where their own appearance of impropriety was raised.[3]

The majority now relies on *Adair* to attack the appearance of impropriety standard of Canon 2(A). It is noteworthy that the majority now uses the statement in *Adair,* in which a party was seeking the disqualification of two justices, to rewrite how the rules governing the conduct of all judges, including the justices of this Court, will now be applied.

Moreover, it must be noted that the members of today's majority (Chief Justice Taylor and Justices Corrigan, Young, and Markman) joined in the creation of a set of required factors for the JTC to apply in judicial discipline cases to ensure that equivalent misconduct is treated equivalently.[4] Two of the *Brown*

---

[2] *Adair v Michigan,* 474 Mich 1027 (2006).

[3] In their January 31, 2006, statement in *Adair,* Chief Justice Taylor and Justice Markman explained their decisions not to recuse themselves from participating in a case in which the Attorney General was representing a party and the motion for disqualification was based on their spouses' employment with the office of the Attorney General. Justices Corrigan and Young agreed with the legal reasoning and analysis of the statement. The alleged appearance of impropriety created by sharing household and income with a spouse who was given an at-will job by a public official whose office regularly appears before the Court was the grounds for the motion for disqualification filed against Chief Justice Taylor and Justice Markman in *Adair*.

[4] See *In re Brown,* 461 Mich 1291, 1292-1293 (2000), authored by Justice Markman.

8

factors that this Court determined are "relevant to the level of sanctions" to be imposed include consideration of the appearance of impropriety.[5] It is inconsistent and lacks common sense for the majority to require that the JTC consider the appearance of impropriety on the one hand, and then preclude consideration of the appearance of impropriety on the other.

The appearance of impropriety violation here—the *appearance* that the judge was accepting a bribe—is a most serious threat to the public's trust and confidence in the judiciary. This *appearance* of accepting a bribe, putting preference in the legal system on sale, and giving favored treatment in return for a gift is inherently detrimental to the legal system.

Let me make it clear again I do not contend that Judge Haley *actually* accepted or was even offered a bribe. But to an objective, informed observer, it would *appear* that Judge Haley was offered and accepted a bribe for favorable treatment.

As the JTC found, "[t]he *appearance* of impropriety in this matter, however, goes right to the heart of a fair, impartial, and unbiased judiciary."[6] The public's confidence in the judiciary is deeply shaken by the belief that some

---

[5] *Id.* at 1292.

[6] Judicial Tenure Commission Decision and Recommendation for Order of Discipline, p 13 (emphasis in original).

attorneys or litigants are treated differently than others on the basis of the gifts offered to a judge.

C

In addition to the majority's stated refusal to consider Judge Haley's appearance of impropriety, in violation of Canon 2(A), the majority inexplicably fails to address an additional seven instances of misconduct.

The Judicial Tenure Commission (JTC) found that Judge Haley's conduct constituted: (1) misconduct in office as defined by Const 1963, art 6, § 30 and MCR 9.205; (2) conduct clearly prejudicial to the administration of justice as defined by Const 1963, art 6, § 30 and MCR 9.205; (3) a failure to establish, maintain, enforce, and personally observe high standards of conduct so that the integrity and independence of the judiciary may be preserved, contrary to Code of Judicial Conduct, Canon 1; (4) irresponsible or improper conduct that erodes the public's confidence in the judiciary in violation of Canon 2(A); (5) conduct involving impropriety and the appearance of impropriety in violation of Canon 2(A); (6) a failure to conduct oneself at all times in a manner that would enhance the public's confidence in the integrity and impartiality of the judiciary, contrary to Canon 2(B); (7) improper acceptance of a gift from a donor whose interests have come, or are likely to come, before the judge, contrary to Canon 5(C)(4)(c); (8) conduct that exposes the legal profession or the courts to obloquy, contempt, censure, or reproach in violation of MCR 9.104(A)(2); and (9) conduct that is

10

contrary to justice, ethics, honesty, or good morals in violation of MCR 9.104(A)(3).

The majority (Chief Justice Taylor and Justices Corrigan, Young, and Markman) premises its acceptance of the recommended discipline on only one of the nine violations cited by the JTC. The majority apparently concludes that the violation of Canon 5(C)(4)(c), which specifically involves the improper acceptance of a gift, makes all the other violations of the Michigan Constitution, court rules, and canons enumerated by the JTC irrelevant.

But the majority's reliance on one violation does not comport with the obligations imposed on judges by the Constitution, court rules, and canons. Nor is such reliance consistent with this Court's precedent. The separate provisions of the Constitution, court rules, and canons have consistently been understood to impose separate obligations and duties upon judges.[7] A violation of a judicial duty is its own separate offense and should continue to be recognized as such.

---

[7] See *In re Trudel,* 468 Mich 1243 (2003) (The judge engaged in judicial misconduct in violation of Canons 1, 2[A], 2[B], 2[C], 3[B][1], 3[B][2], and 3[C].); *In re Lawrence,* 417 Mich 248; 335 NW2d 456 (1983) (The judge was found to have violated Canons 2, 3[C], and 5[C][1] of the Code of Judicial Conduct.); *In re Chrzanowski,* 465 Mich 468; 636 NW2d 758 (2001) (The judge was found to have violated Canons 2[A], 2[C], and 3[B][4] of the Code of Judicial Conduct.); *In re Hocking,* 451 Mich 1; 546 NW2d 234 (1996) (The judge was found to have violated Canons 1, 2[A], 2[B], 3[A][3], and 3[A][8] of the Code of Judicial conduct.); *In re Del Rio,* 400 Mich 665; 256 NW2d 727 (1977) (The judge was found to have violated Canons 1, 2[A], 2[B], and 3[A][3] of the Code of Judicial conduct.); *In re Moore,* 464 Mich 98; 626 NW2d 98 (2001) (The judge was found to have violated Canons 1, 2[A], 2[B], 3[A][3], 3[A][8], 3[A][9], and

(continued…)

11

CONCLUSION

I accept the Judicial Tenure Commission (JTC)'s conclusion that Judge Haley was telling the truth when he stated that the gift of the tickets did not influence the sentence imposed on Mr. Benedict's client. Further, Judge Haley is to be commended for his leadership and hard work in establishing the therapeutic drug courts in the district courts of the counties of Leelanau, Grand Traverse, and Antrim, which have been of great value to the community and the judicial system.

But what occurred on the bench was wrong and unworthy of both Judge Haley and retired Judge, now practicing attorney, Richard Benedict. Judge Haley's actions in accepting the tickets on the bench, during a criminal hearing in which Mr. Benedict was representing the defendant, created an appearance of impropriety that deeply damaged the judicial system.

When confronted with Mr. Benedict's offer of free football tickets during a criminal proceeding, Judge Haley should have simply said, "Mr. Benedict, you are out of order. Please take your seat."

It should be remembered by both judges and attorneys that informality, familiarity, acts of personal friendship, and "Good Ole Boy" activity have no place in a court hearing. Court business is the only business that should be conducted

_____

(…continued)
3[A][10] of the Code of Judicial Conduct.); and *In re Seitz,* 441 Mich 590; 495 NW2d 559 (1993) (The judge was found to have violated Canons 1, 2[A], 2[B], 3[A][3], 3[A][5], 3[A][9], 3[B][1], and 3[B][2] of the Code of Judicial Conduct.).

12

during a court hearing; there should be no impropriety or appearance of impropriety in the courtroom.

The comments of the nonlawyer, citizen members of the JTC bear repeating:

> What is most offending is this whole thing took place on the bench of a courtroom that belongs to the people of the state of Michigan. By popular vote the people bestowed on [Judge Haley] the honor of serving them. They put their confidence and *trust* in him to render justice fairly to all who come before him. His actions violated that trust.
>
> On its appearance the most severe conclusion that can be drawn is a bribe was offered and accepted by a judge during a trial. The least is that the judge's behavior was inappropriate. Either way it was wrong.[8]

The people of the state of Michigan have also put their confidence and trust in the members of this Court to uphold the law as written. It is not expected that when the going gets tough, justices who so ardently and frequently claim to be champions of judicial restraint will conveniently change the manner in which the laws governing their own conduct are to be applied.

Elizabeth A. Weaver

---

[8] Because of the seriousness of the appearance of impropriety created here, I could agree with the two nonlawyer, citizen members of the JTC that Judge Haley should not merely be publicly censured, but should also be suspended without pay for 30 days. However, the JTC's recommendation of a public censure is reasonable in light of its thorough review of the *Brown* factors. Therefore, I concur with the majority's decision to adopt the recommended public censure.

13

In re Honorable MICHAEL J. HALEY
Judge, 86th District Court.

No. 127453

_____

KELLY, J. (*concurring*).

This appeal is from the recommendation of the Judicial Tenure Commission (JTC) that we publicly censure respondent 86th District Court Judge Michael J. Haley.  After having the benefit of full briefing and oral argument of counsel, I agree with the JTC's recommendation to publicly censure Judge Haley.  However, my reasons are different from those of the majority and the JTC.

FACTUAL BACKGROUND

On October 14, 2003, after Judge Haley accepted a defendant's guilty plea, the defendant's attorney, Richard L. Benedict, asked permission of the judge to approach the bench.  When Judge Haley granted the request, both Benedict and the prosecutor approached the judge.   Benedict placed on the bench two tickets to an upcoming University of Michigan Wolverines football game and slid them toward the judge.  The following conversation ensued:

> *Benedict*:  You got to promise to go.
>
> *The Court*: It's a week from Saturday?
>
> *Benedict*:  No, Saturday.

*The Court*: This Saturday, Hmm, I could go.

*Benedict*: Promise?

*The Court*: I promise to go? I've got to make a phone call. Today's Tuesday, where are you tomorrow?

*Benedict*: The office. No, I'm in Kalkaska. If you want it, take it.

*The Court*: Okay. If there's anybody else that—

*Benedict*: When you said you were interested, I indicated that I still have to ask another. If you can't go somebody's got to go.

*The Court*: I'll make sure somebody goes and that you get paid.

*Benedict*: I don't need to get paid.

*The Court*: Okay. All right.

*Benedict*: I need to make sure there are two people sitting in the seats.

Then, although Judge Haley had previously stated on the record that he would sentence Benedict's client on November 6, 2003, he proceeded to sentence the defendant immediately. He later indicated that he had decided to sentence the defendant on the spot in the interest of judicial economy.

PROCEEDINGS BELOW

These events and Judge Haley's responses to the JTC investigation of them led the JTC to file a formal two-count complaint against the judge alleging: (I) "Impropriety and/or the Appearance of Impropriety" and (II) "Misrepresentation/Lack of Candor." Count II was later dismissed.

2

The complaint alleged that Judge Haley's conduct on October 14, 2003, constituted:

a. Misconduct in office as defined by Michigan Constitution 1963, Article VI, § 30 as amended, MCR 9.205, as amended;

b. Conduct clearly prejudicial to the administration of justice as defined by the Michigan Constitution 1963, Article VI, §30 as amended, MCR 9.205, as amended;

c. Failure to observe high standards of conduct so that the integrity and independence of the judiciary may be preserved, contrary to the Code of Judicial Conduct, Canon 1;

d. Irresponsible or improper conduct which erodes public confidence in the judiciary, in violation of the Code of Judicial Conduct, Canon 2A;

e. Conduct involving impropriety and the appearance of impropriety, which erodes public confidence in the judiciary, in violation of the code of Judicial Conduct, Canon 2A;

f. Failure to conduct oneself at all times in a manner which would enhance the public's confidence in the integrity of the judiciary, contrary to the Code of Judicial Conduct, Canon 2B;

g. Allowing family, social, or other relationships to influence judicial conduct or judgment, contrary to Canon 2C;

h. Improper acceptance of a gift from a donor whose interests have come or are likely to come before the court, contrary to Canon 5C(4(c)[sic];

i. Conduct in violation of relevant portions of MCR 9.104 in that such conduct is: prejudicial to the administration of justice, contrary to MCR 9.104(1); exposes the legal profession or courts to obloquy, contempt, censure or reproach, contrary to MCR 9.104(2); contrary to justice, ethics, honesty or good morals, in violation of MCR 9.104(A)(3); and violates the standards or rules of professional responsibility adopted by the Supreme Court, contrary to MCR 9.104(4).

3

This Court appointed retired Circuit Court Judge Casper O. Grathwohl to act as master in this case. After hearing the evidence and reviewing the facts, Judge Grathwohl concluded that, while respondent's actions were improper, they did not constitute judicial misconduct.

The examiner, who conducted the proceeding on behalf of the JTC, objected to the master's finding that respondent's conduct did not constitute judicial misconduct. The JTC heard oral argument on the objection, found judicial misconduct, and issued a recommendation and order of discipline.

In making its recommendation, the JTC applied the factors stated in *In re Brown*, 461 Mich 1291, 1292-1293 (2000). It listed all relevant factors and applied the facts of the case to them. Mindful of this Court's desire for proportionality, the JTC also considered other case holdings involving the acceptance of gifts made in this state and in other jurisdictions.

All nine members of the JTC disagreed with the master and found that Judge Haley had indeed committed judicial misconduct. Seven of the nine recommended public censure. The two members who concurred in part and dissented in part would have publicly censured the judge and suspended him without pay for 30 days.

ISSUES ON APPEAL

On appeal, Judge Haley argues that this Court should reject the JTC's recommendation. He asserts that the finding that acceptance of the football tickets constitutes misconduct was erroneous. He argues that the Code of Judicial

4

Conduct, Canon 5(C)(4)(b), permits the gift of football tickets as an "ordinary social hospitality." He asserts also that the JTC erred in concluding that his conduct gave the appearance of impropriety. Finally, he argues that the recommended sanction of public censure is inappropriate in light of the facts of the case.

In another argument, Judge Haley claims that combining the judicial and prosecutorial functions of the JTC in one body violates due process. This Court recently decided this issue in *In re Chrzanowski,* 465 Mich 468; 636 NW2d 758 (2001). I agree with the majority that combining the investigative and adjudicative functions of the JTC into one body does not offend due process. No persuasive reason has been given to revisit that decision today.

RELEVANT STANDARDS

The power to discipline a Michigan judge lies exclusively in this Court, and the Court exercises it on the recommendation of the JTC. Const 1963, art 6, § 30. This Court reviews the JTC's factual findings and disciplinary recommendations de novo. *In re Hathaway*, 464 Mich 672, 684; 630 NW2d 850 (2001). The appropriate standard of proof is a preponderance of the evidence. *In re Noecker,* 472 Mich 1, 8; 691 NW2d 440 (2005).

THE SOCIAL HOSPITALITY EXCEPTION TO CANON 5(C)

Judge Haley argues that, under the Code of Judicial Conduct, Canon 5(C)(4)(b), his act of accepting the football tickets cannot constitute misconduct.

5

He asserts that the tickets were nothing more than a form of ordinary social hospitality.

Canon 5(C)(4) creates the category of social hospitality. It provides an exception from the prohibition regarding gifts. It states in relevant part:

> Neither a judge nor a family member residing in the judge's household should accept a gift, bequest, favor, or loan from anyone except as follows:
>
> * * *
>
> (b) A judge or a family member residing in the judge's household may accept ordinary social hospitality; a gift, bequest, favor, or loan . . . .

The Michigan Code of Judicial Conduct does not define "ordinary social hospitality," nor has this Court defined it in case law. Other courts have developed tests to determine when a gift may be considered ordinary social hospitality.

California and Illinois courts have set out such tests. California defines a gift that qualifies as ordinary social hospitality as

> "[a] type of social event or other gift which is so common among people in the judge's community that no reasonable person would believe that (1) the donor was intending to or would obtain any advantage or (2) the donee would believe that the donor intended to obtain any advantage." [*Adams v Comm on Judicial Performance*, 10 Cal 4th 866, 880; 42 Cal Rprt 2d 606; 897 P2d 544 (1995), quoting California Judges Ass'n, Judicial Ethics Com, Opinion No 43 (1994), p 4, published in Rothman, California Judicial Conduct Handbook.]

The California Supreme Court in *Adams* emphasized that, in deciding whether something qualifies as social hospitality, the focus should be on "the reasonable

6

perceptions of an objective observer, rather than the motive or intent on the part of the judge." *Adams, supra* at 880.

The Illinois Supreme Court in *In re Corboy*,[1] defined "social hospitality" as "routine amenities, favors, and courtesies, which are normally exchanged between friends and acquaintances, and which would not create an appearance of impropriety to a reasonable, objective observer." The court emphasized that the test is objective, the touchstone being a "careful consideration of social custom." *Id*. The court in *Corboy* stated that such an evaluation should include the following factors:

(1) The monetary value of the gift,

(2) the relationship, if any, between the judge and the donor/lender lawyer,

(3) the social practices and customs associated with gifts and loans, and

(4) the particular circumstances surrounding the gifts and loans. [*Id.* at 43.]

I am persuaded that the *Corboy* test is in conformity with the language of Canon 5(C)(4)(b). It expresses the same meaning of "ordinary social hospitality" as is found in standard dictionaries.[2] Therefore, I would adopt the test.

---

[1] 124 Ill2d 29, 42; 528 NE2d 694 (1988).

[2] *Random House Webster's College Dictionary* (1997) defines "ordinary" as "customary; usual; normal." It defines "social" as "characterized by friendly companionship or relations." And it defines "hospitality" as "the friendly reception and treatment of guests and strangers."

7

The JTC weighed the *Corboy* factors and concluded that the gift of football tickets did not qualify as "ordinary social hospitality." My application of the factors yields the following findings. The monetary value of the two tickets was $92. I agree that their value is within the range of what an ordinary person would find reasonable. Therefore, this factor should be weighed in favor of Judge Haley.

The JTC placed great emphasis on the fact that the relationship between Judge Haley and Benedict did not amount to a friendship. These individuals did not frequent each other's homes or engage in activities together outside the world of legal practitioners. I agree that they did not have a social friendship. But, I disagree with the JTC that the only "social relationship" for purposes of Canon 5(C)(4)(b) is a friendship.

Nothing in the canon precludes a finding that a professional relationship can occasion the giving of gifts that qualify as ordinary social hospitality. A judge and an attorney do not need to be friends for a gift to qualify as ordinary social hospitality. *Corboy* specifically states that an acquaintance relationship is sufficient. *Corboy, supra* at 42. I believe that a purely professional acquaintanceship may also give rise to a situation where an attorney may give a judge a gift acceptable under Canon 5(C)(4)(b).

There was testimony in this case that Judge Haley and Benedict have known each other for many years. It appears from the record that they were in one another's company at least two or three times a week for a period of 17 or 18

8

years. This supports a finding that a long professional relationship existed between them and surely qualified them as acquaintances.

The JTC found and the testimony established that Benedict had never before given Judge Haley football tickets. The JTC used this fact to find that there was no "social practice" of gift-giving between the two. I disagree with the JTC's interpretation of social practices as used in *Corboy*. The term "social practice" has a broader meaning than simply past social activities. It encompasses the local practices and customs associated with gift-giving. *Corboy, supra* at 43. Therefore the question is not only whether Benedict ever gave football tickets to Judge Haley before, but whether persons similarly situated give event tickets as gifts.

It is quite common for one person to offer another an extra ticket to a game, show, or concert. This is especially true if the donor holds season tickets and cannot attend a particular event. The facts of this case show that Benedict holds season tickets to University of Michigan football games. The facts also show that it is common for Benedict to offer tickets to court employees. Benedict is a former judge of the court in which Judge Haley presides and has maintained a relationship with various court employees.

I find that this factor should be weighed in favor of Judge Haley because of actual social practice. Season ticketholders commonly offer tickets to acquaintances when they cannot attend an event themselves, as occurred here.

The JTC found that the circumstances surrounding the gift, the fact that the gift was made to the judge while on the bench, weigh against finding that it is

9

"ordinary social hospitality." I agree. There is nothing ordinary about the location of the gift-giving here. A judge's acceptance of a gift while on the bench, even from a close friend, is improper. This factor should be weighed against Judge Haley.

In summary, my application of the *Corboy* factors to this case leads to a conclusion different from that reached by the JTC. Three factors weigh in favor of finding that the gift of the tickets was acceptable under Canon 5(C)(4)(b). The fourth factor, regarding the circumstances of the gift-giving, does not. However, because a professional relationship existed, the gift was valued at under $100, and it is common practice to give such gifts, I would find that the tickets qualify as "ordinary social hospitality."

The majority holds that "social hospitality requires a social context." *Ante* at 13. It concludes that the gift of the tickets was improper because the exchange took place in a judicial context. *Id.* I disagree with this approach to determining whether a gift qualifies as "ordinary social hospitality."

It is my interpretation of the canon that the focus should be on the gift itself, not on the situation surrounding the gift-giving. The pivotal fact that leads the majority to find that the gift of the tickets was improper is that the gift-giving took place in Judge Haley's courtroom. This suggests that, if it had taken place outside the courtroom, the gift would not have violated any of the judicial canons. I believe that the circumstances surrounding the gift are best evaluated under the "appearance of impropriety" standard set forth in Canon 2. I do not believe that

10

the location of the gift-giving alone determines whether the gift is "ordinary social hospitality."

THE APPEARANCE OF IMPROPRIETY

Judge Haley argues that the JTC erred in finding that his acceptance of the gift gave the appearance of impropriety.

Canon 1 of the Code of Judicial Conduct provides:

> A Judge Should Uphold the Integrity and Independence of the Judiciary

> An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should personally observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. A judge should always be aware that the judicial system is for the benefit of the litigant and the public, not the judiciary. The provisions of this code should be construed and applied to further those objectives.

Canon 2 of the Code of Judicial Conduct provides, in part:

> A Judge Should Avoid Impropriety and the Appearance of Impropriety in All Activities

> A. Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges. A judge must avoid all impropriety and appearance of impropriety. A judge must expect to be the subject of constant public scrutiny. A judge must therefore accept restrictions on conduct that might be viewed as burdensome by the ordinary citizen and should do so freely and willingly.

> B. A judge should respect and observe the law. At all times, the conduct and manner of a judge should promote public confidence in the integrity and impartiality of the judiciary.

Judge Haley argues that the JTC used the wrong standard for determining whether there was an appearance of impropriety. He argues that this Court should

11

apply the standard set forth in *Fredonia Broadcasting Corp v RCA Corp,* 569 F2d 251 (CA 5, 1978). There, the court applied a "layman's standard." The court held that the appearance of impropriety standard should not be defined by using the perceptions of judges or lawyers, but by using the perceptions of nonprofessional people. *Id.* at 256.

The JTC contends that the correct test is expressed in *In Re Johnstone*, 2 P3d 1226 (Alas, 2000). The court in *Johnstone* held that the test is an objective one: whether a reasonable person would believe that an impropriety is afoot.

There are no Michigan cases on point concerning the applicable test for determining when an appearance of impropriety has arisen. I agree with the JTC that the correct test is the objective reasonable person test, one commonly used in the law to determine the validity of a person's conduct.[3]

Therefore, the question is whether Judge Haley's conduct would have appeared improper to a reasonable person objectively viewing the transaction. Judge Haley argues that no evidence was presented showing that his conduct brought disrespect on the judiciary or had any significance to the general public.

However, I note that his own witness, Ronald Jolly, a Traverse City radio talk show host, testified that it was not appropriate for the judge to take the tickets

---

[3] The reasonable person standard appears most often in areas of law pertaining to the evaluation of human conduct, specifically, torts and criminal law. See Prosser & Keeton, Torts (5th ed), § 32, 31 Michigan Law & Practice, 2d, Torts, § 34, and *People v Pouncey*, 437 Mich 382, 389; 471 NW2d 346 (1991).

while on the bench. Others testified that the community was confused about the transaction. The judge himself testified that he realizes in hindsight that it is improper for a judge to accept a gift from any litigant or attorney while on the bench.

I would find that there was an appearance of impropriety here. It was increased by the fact that, immediately after accepting the tickets, the judge changed his mind about when to sentence Benedict's client. To a casual reasonable observer, this suggests that the tickets had some influence on the judge. Even though in fact that may not have been true, a reasonable observer could well have concluded otherwise. This appearance of improper influence violated Canon 2 of the Michigan Code of Judicial conduct.

Judges must be conscious of their actions and be ever mindful that conduct proper in one location may be improper in another. Although taking the football tickets as a gift was not misconduct under Canon 5(C)(4)(b), it gave the appearance of impropriety when it occurred on the bench during court proceedings. In fact, I cannot think of a situation in which it would be appropriate for a judge to accept a gift, "social hospitality" or not, during a regular court proceeding. Therefore, I conclude that the JTC met its burden of proof to show that Judge Haley's conduct created the appearance of impropriety in violation of Canon 2.

The majority holds that it is improper to sanction a judge under Canon 2 if a sanction is appropriate under a different court rule or canon which is more

specific.[4] In the past, this Court has consistently found a violation of Canon 2 in cases where there was also a violation of a direct court rule or canon. See e.g., *In re Gilbert*, 469 Mich 1224; 668 NW2d 892 (2003); *In re Chrzanowski*, 465 Mich 468; 636 NW2d 758 (2001); *In re Moore*, 464 Mich 98; 626 NW2d 374 (2001); *In re Ferrara*, 458 Mich 350; 582 NW2d 817 (1998); *In re Hocking*, 451 Mich 1; 546 NW2d 234 (1996); *In re Seitz*, 441 Mich 590; 495 NW2d 559 (1993). I see no reason, nor has the majority given a reason, to depart in this case from this Court's past treatment of Canon 2.

In its opinion, the majority loses sight of the significance of Canon 2 and sadly weakens it. It renders Canon 2 inapplicable to conduct that, although permissible under a specific canon, without question gives the appearance of impropriety. In the past, one of the functions of Canon 2 was to remind judges that with great power comes great responsibility. Benign acts performed by judges are not always perceived as benign by others. But the majority's ruling reduces the service performed by Canon 2 of fostering an atmosphere of trust and respect by those whose legal problems come before Michigan courts.

---

[4] In support of its holding, the majority refers to statements in *Adair v Michigan,* 474 Mich 1027, 1039, 1051, 1053 (2006) (Taylor, C.J., and Markman, J.), (Corrigan, J., concurring with Taylor, C.J., and Markman, J.) and (Young, J., concurring with Taylor, C.J., and Markman, J.). *Adair* involved a motion for recusal brought against Chief Justice Taylor and Justice Markman. As in this case, there was no adversarial briefing or oral argument on the application of Canon 2.

14

It seems obvious to me that the Code of Judicial Conduct must not only foster behavior but it must occasionally punish judges' acts that appear improper to the reasonable observer. That includes acts that comply with a particular canon but create an impermissible appearance of impropriety under the circumstances in which they are committed. The case before us provides an example of such an act.

The responsibilities of a judge extend not only to the business of the courts in its technical sense, but to the role of the judge in an institutional sense. Judges must not stigmatize the judicial system by the appearance of impropriety. Gray, A*voiding the appearance of impropriety: With great power comes great responsibility,* 28 U Ark Little Rock L Rev 63, 66 (Fall, 2005).

It has been aptly observed that:

> The appearance of impropriety standard does not unfairly assume that judges lack integrity, but the alternative of asking the public simply to trust that judges are upright despite appearances ignores the public's suspicions about public officials in general as well as judges, suspicions that unfortunately have been confirmed and aggravated by scandal after scandal, some of which have involved judges. A reasonable level of cynicism by members of the public is justified; it would be naive and foolish for citizens to blindly trust any public official, and it would imprudent for judges to assume, assert, or act as if they should be exempt from that skepticism. [Id. at 66-67.]

The case of *In re Ellender*[5] illustrates how a judge's conduct may be innocent, yet appear improper. In that matter, the Louisiana Supreme Court considered whether a white judge's Halloween costume consisting of black face

---

[5] 889 So 2d 225 (La, 2004).

15

paint, a fake Afro wig, and an orange prison jumpsuit created an appearance of bias. *Id.* at 227. The judge wore the costume at a party held at a restaurant. Five or six patrons who were not party guests were present, the restaurant being open to the public. The restaurant staff, including an African-American employee, were also present. *Id.*

Someone who saw the judge in costume complained to a local newspaper. The paper ran an article entitled "Local Judge's Masquerade Sparks Racial Concerns." *Id.* The story was picked up by local broadcast media, the Cable News Network, and two television stations in New Orleans. *Id.* The Judiciary Commission received complaints from the National Association for the Advancement of Colored People, and the judge's colleagues. *Id.* at 228.

The district attorney's office reviewed the judge's criminal case rulings and found no race-based disparity in his sentencing. *Id.* at 232. However, the Louisiana Supreme Court and the Judiciary Commission agreed that the judge's conduct "called into question his ability to be fair and impartial towards African-Americans who appear before his court as defendants in criminal proceedings, as well as towards any African-American litigant or attorney in any proceeding before him, thereby creating the appearance of impropriety." *Id.* at 229.

Both the court and the commission agreed that the judge did not intend to embarrass African-Americans. But the court concluded that "his behavior exhibits his failure to appreciate the effects of his actions on the community as a whole." *Id.* at 233.

In years past, such conduct in Michigan would have been held to violate Canon 2 and would have subjected the judge to discipline. However, I now question whether, under the majority's interpretation of Canon 2 here and in *Adair*, the judge in *In re Ellender* would be disciplined in this state for creating an appearance of impropriety. Like Justice Cavanagh, I question whether the majority's analysis has left anything remaining of Canon 2.

APPROPRIATE DISCIPLINE

This Court's primary concern in determining an appropriate sanction for judicial misconduct is to restore and maintain the dignity and impartiality of the legal system and to protect the public. *In re Noecker, supra* at 12-13, quoting *In re Ferrara*, 458 Mich 350, 372; 582 NW2d 817 (1998). In *In Re Brown*,[6] this Court listed several factors that should be considered in deciding an appropriate sanction for a judge:

> (1) misconduct that is part of a pattern or practice is more serious than an isolated instance of misconduct;
>
> (2) misconduct on the bench is usually more serious than the same misconduct off the bench;
>
> (3) misconduct that is prejudicial to the actual administration of justice is more serious than misconduct that is prejudicial only to the appearance of propriety;
>
> (4) misconduct that does not implicate the actual administration of justice, or its appearance of impropriety, is less serious than misconduct that does;

---

[6] *Supra* at 1292-1293.

17

(5) misconduct that occurs spontaneously is less serious than misconduct that is premeditated or deliberated;

(6) misconduct that undermines the ability of the justice system to discover the truth of what occurred in a legal controversy, or to reach the most just result in such a case, is more serious than misconduct that merely delays such discovery;

(7) misconduct that involves the unequal application of justice on the basis of such considerations as race, color, ethnic background, gender, or religion are more serious than breaches of justice that do not disparage the integrity of the system on the basis of a class of citizenship.

Central to my decision about the appropriate sanction in this case is my conclusion that the judge's conduct adversely affected the appearance of impartiality of the court. It is crucial to the functioning of the judiciary that the courts be fair and impartial and that the public perceive them that way. Judge Haley's acceptance of the tickets in open court made it appear that Benedict had an influence on the judge that was favorable to him and was not shared by others.

The courts of this state can continue to operate as a suitable forum for dispute resolution only as long as the public believes that they are unbiased and fair. Conduct like respondent's undermines the public's belief in the ability of the courts to function impartially.

Because the misconduct was spontaneous, not premeditated or deliberated, I conclude that a public censure is sufficient.

## CONCLUSION

I would hold that the gift of the football tickets was ordinary social hospitality within the meaning of Canon 5(C)(4)(b) of the Michigan Code of

Judicial Conduct. But the location of the gift-giving together with its timing constituted an appearance of impropriety for which the sanction of public censure is warranted. A judge must scrupulously observe the canons of judicial ethics when accepting gifts, and under no circumstances should a judge accept a gift while on the bench adjudicating a proceeding.

For the reasons stated above I concur with the majority's decision to publicly censure Judge Haley.

Marilyn Kelly